## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BANNER HEART HOSPITAL, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| SYLVIA M. BURWELL, Secretary, ) | Case No. 1:14-cv-1195 (APM) |
| United States Department of ) | |
| Health and Human Services, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR ORAL HEARING

Plaintiffs Banner Heart *et al.*, pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7(h) and 7(n), hereby move for the entry of summary judgment for Plaintiffs.  In support of this motion, Plaintiffs rely on the accompanying Memorandum of Points and Authorities.  A proposed order setting forth the relief requested by this motion is also attached.

Pursuant to Local Rule 7(f), Plaintiffs respectfully request an oral hearing on their Motion for Summary Judgment.

4829-1477-2260.

Date: June 1, 2015                    Respectfully submitted,

                                      _s/ Stephen Nash_____
                                      Stephen Nash (D.C. Bar No. PA0037)
                                      Sven Collins*
                                      Michi Tsuda*
                                      Mimi Hu Brouillette*
                                      *Motion for Pro Hac Vice Pending
                                      SQUIRE PATTON BOGGS (US) LLP
                                      1801 California St., Ste 4900
                                      Denver, CO 80202
                                      (303) 894-6173
                                      E-mail: stephen.nash@squirepb.com

                                      Counsel for Plaintiffs

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BANNER HEART HOSPITAL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| SYLVIA M. BURWELL, Secretary, | ) | Case No. 1:14-cv-1195 (APM) |
| United States Department of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

STATUTORY & REGULATORY BACKGROUND ..................................................................3

   I.  Congress Enacted 42 U.S.C. § 1395oo To Expand Hospitals' Rights To Appeal
      Medicare Payment Determinations.......................................................................................3

   II.  HHS Has Repeatedly And Erroneously Interpreted 42 U.S.C. §1395oo In A
      Manner To Limit Hospital Appeal Rights ...........................................................................5

      A.  The Supreme Court, in *Bethesda Hospital Ass'n v. Bowen*, rejected HHS's
           original "self-disallowance" policy, which had limited hospital appeals.....................5

      B.  For twenty years after *Bethesda*, HHS acquiesced in the Supreme Court's
           interpretation of section 1395oo ..................................................................................6

      C.  In 2008, HHS reintroduced its self-disallowance policy ..............................................6

      D.  In 2014, in response to the first legal challenges to the renewed self-
           disallowance policy, HHS both confessed the policy's partial invalidity, which
           triggered a permanent injunction by this court, and proposed to amend its
           regulations to again alter the basis for the policy ........................................................8

      E.  Section 115 of the PRM – HHS's Chameleon...........................................................11

RECORD FACTS.................................................................................................................13

   I.  The Hospitals timely filed, and the Medicare contractors accepted and audited,
      their cost reports for their fiscal year ending in 2008, which included all relevant
      information as to the costs incurred by the Hospitals as related to outlier
      reimbursements ................................................................................................................13

   II.  The Hospitals filed timely Board appeals premised on dissatisfaction with their
      total reimbursement determinations, but the Board dismissed those appeals
      applying the renewed self-disallowance regulation .........................................................14

   III.  HHS failed to disclose key facts at any time before the Hospitals' fiscal year 2008
       cost reports were due which facts revealed grounds for challenging HHS's
       regulations.......................................................................................................................15

      A.  The Interim Final Rule – discovered in 2012. ...........................................................16

B.  In 2012, HHS's OIG issued a report contradicting HHS's published explanation as to reconciliation of outlier payments ...................................................18

STANDARD OF REVIEW ................................................................................................20

ARGUMENT ....................................................................................................................21

I.  HHS' Renewed Self-Disallowance Regulation Conflicts With The Plain Language Of The Statute As Interpreted By The Supreme Court in *Bethesda* ................21

A.  *Bethesda* rejected HHS's effort to impose a requirement that hospitals exhaust regulatory challenges with the Medicare contractor ...................................21

B.  HHS's renewed self-disallowance policy is an invalid attempt to overrule *Bethesda* and violates the statute for the same reasons as HHS's prior policy...........25

II.  HHS's Interpretation Is Also Unreasonable Under *Chevron* Step Two ...........................28

III.  The Self-Disallowance Regulation Is Arbitrary and Capricious .......................................29

A.  Medicare contractors have no authority to address regulatory challenges, so it serves no purpose of administrative exhaustion to preview such challenges with them .......................................................................................................30

B.  HHS's renewed self-disallowance policy regarding regulatory challenges, by definition, serves no other administrative purpose because Medicare contractors have no duty even to glance at self-disallowed claims presented............31

C.  That the Board may have to "adjudicat[e] disputes as to whether an omitted cost is or is not [payable under current] Medicare payment policy" is consistent with its role and does not support the self-disallowance policy .................32

D.  HHS's failure to explain its flip flopping interpretations of section 1395oo, both before and after 2008, demonstrates the arbitrary and capricious nature of its 2008 interpretation .................................................................................33

E.  HHS's renewed self-disallowance regulation invalidly requires hospitals to act on the basis of incomplete information .......................................................36

IV. HHS's Self-Disallowance Regulation Violates The APA's Procedural Requirements Concerning Incorporation By Reference ....................................................39

V.  Remand Is Not Necessary Because the Board Granted Expedited Judicial Review For Other Hospitals In the Same Group Appeal On the Same Substantive Challenge .......................................................................................................43

CONCLUSION...................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Appalachian Power Co. v. EPA*,
  566 F.2d 451 (4th Cir. 1977) ................................................................................40

*Banner Health v. Burwell*,
  No. 10-01638 (CKK), 2014 U.S. Dist. LEXIS 91668 (D.D.C. July 7, 2014) ........................18

*Banner Health v. Sebelius*,
  905 F. Supp. 2d 174 (D.D.C. 2012) ................................................................................3

*Banner Health v. Sebelius*,
  945 F. Supp. 2d 1 (D.D.C. 2013) ................................................................................13, 17

*\*Bethesda Hosp. Ass'n v. Bowen*,
  485 U.S. 399 (1988) ................................................................................ passim

*Brock v. Cathedral Bluffs Shale Oil Co.*,
  796 F.2d 533 (D.C. Cir. 1986) ................................................................................39

*Cape Cod Hosp. v. Sebelius*,
  630 F.3d 203 (D.C. Cir. 2011) ................................................................................37

*Chevron U.S.A., Inc. v. NRDC, Inc.*,
  467 U.S. 837 (1984) ................................................................................20, 28

*Cnty. of Los Angeles v. Shalala*,
  192 F.3d. 1005 (D.C. Cir. 1999) ................................................................................16

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................33

*Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala*,
  165 F.3d 1162 (7th Cir. 1999) ................................................................................33

*Loma Linda Univ.Med.Ctr. v. Leavitt*,
  492 F.3d 1065 (9th Cir. 2007) ................................................................................27, 32

*MaineGeneral Med. Ctr. v. Shalala*,
  205 F.3d 493 (1st Cir. 2000) ................................................................................33

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................21

i

*Nat'l Ass'n of Mfrs. v. NLRB*,
    717 F.3d 947 (D.C. Cir. 2013), *reh'g den'd en banc*, 2013 U.S. App. LEXIS 18566
    (D.C. Cir. Sept. 4, 2013) ...........................................................................................................20

*Nichols v. Bd. of Trustees of The Asbestos Workers Local 24 Pension Plan*,
    835 F.2d 881 (D.C. Cir. 1987) ................................................................................................26

*PPG Indus., Inc. v. Costle*,
    659 F.2d 1239 (D.C. Cir. 1981) .............................................................................39, 40, 42

*Shays v. FEC*,
    528 F.3d 914 (D.C. Cir. 2008) ..........................................................................................20, 28

*UMDNJ-Univ. Hosp. v. Leavitt*,
    539 F. Supp.2d 70 (D.D.C. 2008) .................................................................................27, 28, 33

*United States v. Duvall*,
    740 F.3d 604 (D.C. Cir. 2013) ..................................................................................................20

## STATUTES

5 U.S.C. § 522 ..........................................................................................................................42

5 U.S.C. § 552 ...........................................................................................................39, 40, 41, 42

5 U.S.C. § 553 ....................................................................................................................40, 41, 42

42 U.S.C. § 1395f ........................................................................................................................3

42 U.S.C. § 1395g ...................................................................................................................3, 10

42 U.S.C. § 1395l ......................................................................................................................10

42 U.S.C. § 1395oo ............................................................................................................... passim

42 U.S.C. §§ 1395ww(d)(3) & (d)(5)(A) ..............................................................................16

## OTHER AUTHORITIES

1 C.F.R. § 51.1 .........................................................................................................................40

1 C.F.R. § 51.5 .........................................................................................................................40

1 C.F.R. § 51.7 .........................................................................................................................40

1 C.F.R. § 51.9 .........................................................................................................................40

42 C.F.R. § 405.1803 ...............................................................................................................4

42 C.F.R. § 405.1835 ........................................................................................................ passim

Medicare Program; Change in Methodology for Determining Payment for Extraordinarily
    High-Cost Cases (Cost Outliers) Under the Acute Care Hospital Inpatient and Long-
    Term Care Hospital Prospective Payment Systems,
    68 Fed. Reg. 34,494 (June 9, 2003) ...................................................................................16

Medicare Program; Provider Reimbursement Determinations and Appeals
    69 Fed. Reg. 35,716 (proposed June 25, 2004) .......................................................6, 7, 34, 40

Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and
    Fiscal Year 2008 Rates,
    72 Fed. Reg. 47,130 (Aug. 22, 2007).................................................................................18

Medicare Program; Provider Reimbursement Determinations and Appeals
    73 Fed. Reg. 30,190 (May 23, 2008) ............................................................................ passim

Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care
    Hospitals and the Long-Term Care Hospital Prospective Payment System and FY
    2012 Rates; Hospitals' FTE Resident Caps for Graduate Medical Education Payment,
    76 Fed. Reg. 51,476 (Aug. 18, 2011)..................................................................................37

Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care
    Hospitals and the Long-Term Care Hospital Prospective Payment System and Fiscal
    Year 2015 Rates; Quality Reporting Requirements for Specific Providers; Reasonable
    Compensation Equivalents for Physician Services in Excluded Teaching Hospitals;
    Provider Administrative Appeals and Judicial Review; Enforcement Provisions for
    Organ Transplant Centers; and Electronic Health Record (EHR) Incentive Program,
    79 Fed. Reg. 27,978 (proposed May 15, 2014) ...............................................................10, 41

Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care
    Hospitals and the Long-Term Care Hospital Prospective Payment System and Fiscal
    Year 2015 Rates; Quality Reporting Requirements for Specific Providers; Reasonable
    Compensation Equivalents for Physician Services in Excluded Hospitals and Certain
    Teaching Hospitals; Provider Administrative Appeals and Judicial Review;
    Enforcement Provisions for Organ Transplant Centers; and Electronic Health Record
    (EHR) Incentive Program,
    79 Fed. Reg. 49,854 (Aug. 22, 2014)..............................................................................11, 41

H.R. Rep. No. 92–231 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989...........................................4

H.R. Rep. No. 96–1167 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5526........................................5

S. Rep. No. 92–1230 (1972) ......................................................................................................4

Centers for Medicare and Medicaid Services, The Provider Reimbursement Manual-Part
    2, Chapter 1, Cost Reporting – General, No. 15-2, § 115 (2008) ...................................Passim

## INTRODUCTION

This case involves the attempt of the defendant Secretary of the United States Department of Health and Human Services ("HHS") to resurrect an invalid statutory interpretation of 42 U.S.C. § 1395oo. Section 1395oo establishes the agency's Provider Reimbursement Review Board ("Board") and the rights of Medicare hospitals to appeal HHS's payment determinations within 180 days after the hospital receives its notice of program reimbursement, or "NPR." In 1988, the Supreme Court rejected HHS's attempt to impose a sub-statutory exhaustion requirement for hospital appeals: *i.e.*, HHS's position that the Board had no jurisdiction to hear a hospital's "challenge to one of [HHS's] regulations [if]. . . the provider failed to contest the regulation's validity in the cost report submitted to its [Medicare payment contractor]." *See Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 401 (1988) ("*Bethesda*"). As Medicare payment contractors have no authority to address regulatory challenges, the Supreme Court held that HHS had invalidly imposed a "futile" exhaustion requirement, which was "inconsistent with the express language of" section 1395oo. *Id.* at 404.

HHS followed *Bethesda*'s holding for 20 years. In 2008, however, HHS promulgated a regulation premised upon the same previously rejected interpretation of section 1395oo. Effective for cost reporting periods ending on or after December 31, 2008, HHS is once again requiring the Board to dismiss all challenges to HHS's regulations if they were not first submitted to the hospital's Medicare payment contractor, *i.e.*, noted on the hospital's cost report. Thus, in effect, HHS once again seeks to require that hospitals anticipate and preserve their right to claim "dissatisfaction" several years before section 1395oo's deadline for filing an appeal (180 days after receipt of the NPR) has even started to run.

Having lost, in *Bethesda*, its gambit to justify its self-disallowance policy as a statutory exhaustion requirement, HHS switched to a new rationale with its renewed self-disallowance regulation, claiming that it is "more akin to simply a presentment requirement." This is pure form over substance and fails to persuade. Moreover, even as to this new rationale, HHS has wavered by issuing yet another round of proposed revised self-disallowance regulations, purportedly justified, this third time, as a "cost reporting requirement." 73 Fed. Reg. 30,190, 30,197 (May 23, 2008). HHS's renewed self-disallowance policy amounts to a regulation in search of a rationale, is directly contrary to *Bethesda* and fails again this second time around.

Plaintiffs are eleven acute care hospitals (the "Hospitals") participating in the Medicare program. The Hospitals timely filed a group appeal with the Board, asserting challenges to the agency's regulations governing certain supplemental "outlier" payments during their fiscal year ending in 2008, and the underpayments flowing from the invalid regulations. HHS, acting through the Board, improperly dismissed the Hospitals' appeal, ruling that the Hospitals had failed to comply with HHS's renewed self-disallowance regulation.

The Hospitals challenge the Board's decision dismissing their group appeal, which is HHS's final action, on the following grounds: (1) HHS's renewed self-disallowance regulation, and the Board's decision relying on same, violate the statute, as interpreted in *Bethesda*; (2) HHS's renewed self-disallowance regulation, and the Board's decision relying on same, are not a reasonable interpretation of the statute; (3) HHS's renewed self-disallowance regulation, and the Board's reliance thereon, are arbitrary and capricious and otherwise not in accordance with law under the Administrative Procedure Act ("APA"), and (4) HHS promulgated the renewed self-disallowance regulation in violation of the APA's procedural requirements.

The Hospitals respectfully request that this Court enter an order holding (a) that HHS's renewed self-disallowance regulation, as applied to challenges to regulations, is invalid, (b) that the Hospitals' appeals satisfy all of the jurisdictional requirements of section 1395oo, (c) that there is no need to remand to the Board because it has no authority to hear the merits of the Hospitals' substantive claims, and (d) that the Hospitals shall be permitted to file an amended complaint pleading their substantive claims within 20 days after the Court's order.

## STATUTORY & REGULATORY BACKGROUND

### I.     Congress Enacted 42 U.S.C. § 1395oo To Expand Hospitals' Rights To Appeal Medicare Payment Determinations

Since 1983, HHS has "reimbursed qualifying providers at prospectively fixed rates." *Banner Health v. Sebelius*, 905 F. Supp. 2d 174, 177 (D.D.C. 2012).  Under this Prospective Payment System, HHS makes periodic payments to a hospital over the course of the hospital's fiscal year based upon an estimate of the amounts owed.  42 U.S.C. § 1395g.  After the end of the hospital's fiscal year, it must submit a cost report, which serves as a claim for reimbursement.  42 U.S.C. § 1395f(a).  The cost report consists of numerous schedules, worksheets, and supplemental worksheets, together setting forth the hospital's costs for the given fiscal year.  The cost report is reviewed by the hospital's Medicare contractor.[1]  The Medicare contractor, acting as an agent of HHS and bound by HHS's regulations and policies, audits the cost report and issues a "notice of program reimbursement" ("NPR") that specifies the total

---

[1] The Medicare contractors were previously known as fiscal intermediaries, but then transitioned into what are now known as "Medicare administrative contractors."  *See, e.g.*, *Ctrs. for Medicare & Medicaid Servs.*, Important Information Regarding the Completed A/B MAC Transition, http://www.cms.gov/medicare-coverage-database/staticpages/a-b-mac-transitions.aspx (last visited May 30, 2015).  Some of the earlier cases and materials cited in this brief use the "fiscal intermediary" terminology, but intermediaries serve the same role as Medicare contractors and, thus, this brief uses the term Medicare contractor.

amount of reimbursement due to the hospital under existing regulations and policies and explaining any adjustments to the costs claimed by the hospital.  42 C.F.R. § 405.1803.

In 1972, and through subsequent amendments, Congress enacted a statute creating an administrative and judicial appeal process for Medicare reimbursements.  This process included the right for hospitals to appeal reimbursement determinations to the Board.  The Committee on Ways and Means acknowledged that "[u]nder [then] present law there is no specific provision for an appeal by a provider of services of a [Medicare contractor's] final reasonable cost determination," and that "it is desirable to prescribe in law a specific [appeals] procedure for settling disputed final determinations applying to the amount of program reimbursement."  H.R. Rep. No. 92–231 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5094; *see also* S. Rep. No. 92– 1230, at 51, 248 (1972).  Accordingly, Congress enacted Hospital appeal rights at 42 U.S.C. § 1395oo.  Section 1395oo(a) sets forth three requirements for a hospital that has timely filed its cost report and received its NPR to invoke the Board's jurisdiction.  The hospital may obtain a hearing before the Board with respect to its cost report if

> (1) such provider --
>
> (A)(i) is dissatisfied with a final determination of . . . its fiscal intermediary . . . as to the amount of total program reimbursement due the provider . . . for the period covered by such report,
>
> . . . . .
>
> (2) the amount in controversy is $ 10,000 or more, and
>
> (3) such provider files a request for a hearing within 180 days . . . .

42 U.S.C. § 1395oo(a).

Hospital appeal rights were further enhanced in 1980 when Congress created the right for expedited judicial review of challenges to a controlling question of law or regulation over which the Board lacks authority.  42 U.S.C. § 1395oo(f)(1).  Recognizing that it would be futile for the

Board to hold a hearing on a question of law or regulation by which it was bound, Congress

intended to avoid futile exercises at the Board and allowed hospitals to proceed directly to

district court on such challenges.  H.R. Rep. No. 96–1167, *reprinted in* 1980 U.S.C.C.A.N. 5526,

5757 (stating that a requirement that a provider must have a hearing at the Board even where the

provider challenges a regulation by which the Board is bound would "delay the resolution of

controversies for extended periods of time . . . [would] require providers to pursue time-

consuming and irrelevant administrative review merely to have a right to bring suit in a U.S.

District Court.").

## II.     HHS Has Repeatedly And Erroneously Interpreted 42 U.S.C. §1395oo In A Manner To Limit Hospital Appeal Rights

### A.     The Supreme Court, in *Bethesda Hospital Ass'n v. Bowen*, rejected HHS's original "self-disallowance" policy, which had limited hospital appeals

In the early 1980s, HHS interpreted 42 U.S.C. § 1395oo as setting forth a pre-condition

to hospital challenges to HHS regulations.  According to HHS, such challenges could not be

asserted for the first time within the appeal deadline under the statute (180 days after receipt of

their NPR).  Instead, such regulatory challenges had to be exhausted years earlier, with the

Medicare contractor, by giving notice, on the cost report, of the hospital's intent, ultimately, to

challenge the applicable regulation.  *See Bethesda*, 485 U.S. at 404.  HHS claimed that this was a

necessary exhaustion requirement for hospitals to show they were "dissatisfied" with their total

program reimbursement.  *Id.* According to HHS's interpretation, the Board had no jurisdiction to

hear claims for any costs that a Hospital had not "self-disallowed" – *i.e.*, costs the hospital did

not claim on its cost report because it was not entitled to such costs under existing regulations.

In 1988, in the *Bethesda* case, the Supreme Court reviewed this early interpretation by

HHS of section 1395oo.  As will be discussed in detail below (*see infra* at 21-24), the Supreme

Court rejected HHS's interpretation as "inconsistent with the express language of the statute" under *Chevron* step one analysis.  *Id.*

**B.      For twenty years after *Bethesda*, HHS acquiesced in the Supreme Court's interpretation of section 1395oo**

As HHS admits, "[f]ollowing the *Bethesda* decision, [HHS] no longer required providers to claim items for which the [Medicare contractor] did not have the discretion to award payment due to a regulation or manual provision.  (See former Appendix A, § B.1. of the Provider Reimbursement Manual (PRM))."  69 Fed. Reg. 35,716, 35,722 (proposed June 25, 2004) (AR 008).  Appendix A, § B.1., before it was deleted in June 2000, stated:

> B. *Appealable Decisions.*—There are a variety of final determinations that are appealable to the Board.  These final determinations are final determinations of the Secretary, and are made by [CMS], which has been delegated the authority from the Secretary to administer the Medicare program; and/or the [Medicare contractors] who, under contract, act as [CMS's] agents in administering the Medicare program.
>
> . . .
>
> The following list describes several of the possible final determinations which are appealable before the Board:
>
> 1. *Original Notice of Program Reimbursement (NPR).*—The audit adjustments included in the [Medicare contractor's] original notice of program reimbursement are appealable to the Board.  Also, <u>any self-disallowed cost which was not included on the cost report because the [Medicare contractors] would have been bound by a law, statute, [CMS] ruling, regulation, or manual provision to disallow such a cost is appealable with the original NPR.</u>

Medicare and Medicaid Guide Explanations and Annotations, PROVIDER REIMBURSEMENT REVIEW BOARD JURISDICTION—Appendix A (Prov. Reimb. Man., Part I, §2926), Centers for Medicare and Medicaid Services ("CMS") (2000) (emphasis added) ("Appendix A").

**C.      In 2008, HHS reintroduced its self-disallowance policy**

In 2004, with the stated objective of reducing "a backlog of approximately 10,000 cases before the Board," HHS published a proposed rulemaking to revise many regulations governing

provider reimbursement determinations and appeals.  69 Fed. Reg. at 35,717-18 (AR 003-04).

By imposing complicated (and in some cases unauthorized) procedural obstacles, HHS sought to

constrict a hospital's ability to obtain review before the Board.  Among these was the

reintroduction of HHS's pre-*Bethesda* era self-disallowance requirement.

HHS gave notice that it intended, once again, to require hospitals to "self-disallow the

item where [the hospital] is seeking reimbursement that it believes may not be in accordance

with Medicare policy (for example, where the intermediary does not have the discretion to award

the reimbursement sought by the provider).  In order to self-disallow an item, the provider would

be required to follow the applicable procedures for filing a cost report under protest, which are

contained currently in § 115 of the PRM, Part 2 (CMS Pub. 15–2)."  69 Fed. Reg. at 35,722 (AR

008).

Thus, HHS proposed a return to the pre-*Bethesda* era by requiring a hospital to include on

its cost report notice of its future intent to challenge HHS regulations or payment policies.  This

in order to demonstrate "dissatisfaction" with the determination of its total amount of

reimbursement, notwithstanding that the Medicare contractor still had no authority to declare

regulations invalid and, instead, was still required to follow existing payment regulations and

policies when it audited cost reports.

Numerous comments were filed objecting to HHS's proposed renewed self-disallowance

policy because it directly conflicted with *Bethesda*.  73 Fed. Reg. at 30,196 (AR 308); *see also*

AR 95-96, 157 ("CMS offers no explanation in the Federal Register as to how this change can be

consistent with the Supreme Court's decision in *Bethesda*."); AR 205 ("The 180-day filing

period for an appeal would be effectively eliminated if the requirement was to protest all of the

issues in the filed cost report. . . .  To impose restrictive time limitations represents a rejection of

the Supreme Court decision in Bethesda [sic] and will generate additional litigation."); AR 227;

243-46 ("the Secretary has no authority to overturn a decision of the Supreme Court interpreting

the requirements of a federal statute."). Comments also noted that the "emphasis on specific

items [of dissatisfaction] is not found in the statute." AR 96, 157; *see also* AR 235-36 ("The

statute does not require that providers recite some specific expression in the cost report to

foreshadow that they will be dissatisfied with a final determination. CMS is placing form over

substance in this regard."). Some commenters argued against the proposed regulation because

"[p]roviders should not be held responsible for discovering errors made on the part of

government bodies." AR 113; 73 Fed. Reg. at 30,198 (AR 310). Finally, a few commenters

noted that the actual procedure for self-disallowance is unclear. AR 104, 293, 298.

Four years after its proposal, in 2008, HHS published the final renewed self-disallowance

regulation. 73 Fed. Reg. at 30,190 (AR 301-02). HHS adopted its proposal on self-disallowance

without material modification. 73 Fed. Reg. at 30,195 (AR 307). Effective with cost reporting

periods ending on or after December 31, 2008, hospitals must now "self-disallow" items where

they seek reimbursement that is not in accordance with published Medicare policy. *Id.* In order

to "self-disallow," hospitals must follow "applicable procedures" for filing a cost report under

protest. *Id.* Neither the amended 42 C.F.R. § 405.1835 nor its regulatory preamble, sets forth

the necessary "applicable procedures" that now bind all providers. Instead, the preamble states

that the procedures are contained in "section 115 of the PRM, Part II (CMS Pub. 15–2)." *Id.*

    **D.**    **In 2014, in response to the first legal challenges to the renewed self-disallowance policy, HHS both confessed the policy's partial invalidity, which triggered a permanent injunction by this court, and proposed to amend its regulations to again alter the basis for the policy**

Despite already having taken three bites at the apple, HHS has continued to waver in its

interpretation of the requirements for Board jurisdiction under section 1395oo, as is reflected in

several of HHS's recent actions.  First, in response to a legal challenge, HHS recently confessed

the invalidity of one half of the self-disallowance regulation.  Next, HHS published a proposed

regulation recasting its rationale for the self-disallowance hurdle as a "cost reporting"

requirement rather than a "dissatisfaction" or "presentment" requirement.  These recent actions

speak volumes about HHS's level of discomfort with its renewed self-disallowance policy.

     In May 2013, several hospitals filed lawsuits challenging the validity of HHS's renewed

self-disallowance regulation as applied to hospital appeals filed in the absence of their receipt of

timely NPRs.[2]  *See, e.g.*, Complaint, Lee Mem'l Health Sys. v. Sebelius, No. 1:13-cv-00643

(RMC) (D.D.C. May 3, 2013) ("*Lee Mem'l*"), ECF No. 1.  In addition to permitting appeals from

NPRs (such as those here at issue), section 1395oo(a)(1) also expressly allows for Board appeals

where a Medicare contractor fails to issue a timely NPR.  Although HHS's renewed self-

disallowance regulation expressly requires self-disallowance on the cost report for both types of

appeals, section 1395oo does not require that a hospital be "dissatisfied" with respect to appeals

filed where no timely NPR is received.  *Compare* 42 C.F.R. § 405.1835(a)(1) (2008), *with* 42

U.S.C. § 1395oo(a)(1) (2008) (same as stated in 2015).

     HHS did not answer these law suits.  Instead, HHS stated that it "would not defend the

application of 42 C.F.R. § 405.1835(a)(1) to Board appeals based on late NPRs. . . ."  *See*

---

[2] The renewed self-disallowance regulation was promulgated during a period when HHS had
directed a nationwide stay on Medicare contractors from issuing NPRs.  *See, e.g*, Ctrs. for
Medicare and Medicaid Servs., Disproportionate Share Hospital (DSH),
http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/dsh.html.
This was triggered by the need for HHS to recalculate another significant aspect of Medicare
reimbursement, following several court losses.  *Id.* (citing to CMS-1498-R2, which was issued in
response to HHS's loss in *Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20 (D.D.C. 2008),
*amended by* 587 F. Supp. 2d 37 (D.D.C. 2008)).  The moratorium held up the issuance of new
NPRs for FYs 2006-2009 until approximately 2012, pending CMS's release of certain data,
delaying final determinations with respect to cost reports that first became subject to HHS's
renewed self-disallowance regulation (those ending on or after December 31, 2008), such as
those here at issue.

Defendant's Response to Order to Show Cause at ¶ 2, *Lee Mem'l*, No. 1:13-cv-00643 (D.D.C.

June 17, 2014), ECF No. 37.  HHS asked the court to enter judgment for the plaintiffs on their

challenge to the self-disallowance regulation.  *See* Defendant's Proposed Order, *Lee Mem'l*, No.

1:13-cv-00643 (D.D.C. June 17, 2014), ECF No. 37-1.

Further, after confessing the invalidity of its self-disallowance regulation as applied to

appeals filed in the absence of a timely NPR, HHS proposed yet again to change the self-

disallowance requirement.  This time, in May 2014, HHS proposed requiring self-disallowance

as a necessary element of a complete cost report, citing the agency's general authority to

promulgate rules governing cost report filing under 42 U.S.C. §§ 1395g and 1395l. Thus, HHS

was proposing to abandon its 2008 justification of the self-disallowance requirement as

necessary to demonstrate "dissatisfaction" under section 1395oo(a).  79 Fed. Reg. 27,978,

28,209-16 (proposed May 15, 2014).

In this same notice of proposed rulemaking, HHS also proposed to include the

"applicable procedures" for self-disallowance in the text of the regulation:

> In order to self-disallow a specific item, the provider would have to follow the
> applicable procedures for filing a cost report under protest, which are now
> contained in section 115 of the PRM, Part 2 and are included in proposed
> paragraph (j)(2) of § 413.24.  Specifically, the provider would have to include an
> estimated payment amount for each self-disallowed item in the 'protested amount'
> line of the cost report, and attach a worksheet explaining why a self-disallowance
> is necessary (instead of claiming payment for the item in its cost report) and
> describing how it determined the estimated payment amount for each self-
> disallowed item.

*Id.* at 28,209. The proposed § 413.24(j)(2) also spelled out the procedural requirements.  79 Fed.

Reg. at 28,306.

The plaintiffs in the above-described cases, challenging the self-disallowance regulation,

reported to the court that HHS's proposed amendment conflicted with its concession that the

regulation could not be applied to appeals filed in the absence of a timely NPR.   Plaintiffs'

Reply to Defendant's Responses to Order to Show Cause and Defendant's Proposed Order at ¶ 3, *Lee Mem'l*, No. 1:13-cv-00643 (D.D.C. July 1, 2014), ECF No. 38.  Soon thereafter, the court issued orders in several pending cases finding that HHS "made a binding concession that 42 C.F.R. § 405.1835(a)(1)'s requirement, that a Medicare provider must establish its 'dissatisfaction' by claiming reimbursement for the item in question in its Medicare cost report or by listing the item as a 'protested amount' in its cost report, should not apply to [Board] appeals [based on a Medicare contractor's failure to timely issue an NPR]."  *See, e.g.*, Order at 1-2, *Lee Mem'l*, No. 1:13-cv-00643 (D.D.C. Aug. 6, 2014), ECF No. 40.  The court further ordered "that the Board, the rest of [HHS], and all current and future Medicare contractors are enjoined from applying 42 C.F.R. § 405.1835(a)(1)'s 'dissatisfaction' requirement for Board jurisdiction to any pending or future Board appeal that, pursuant to 42 U.S.C. § 1395oo(a)(1)(B), is based on the Medicare contractor's failure to issue a timely NPR."  Order at 2, *Lee Mem'l*, No. 1:13-cv-00643, ECF No. 40.

Within a few months after the court's injunction, HHS published its final regulation. HHS did not finalize the proposed amendments to the cost report filing process and its self-disallowance policy.  79 Fed. Reg. 49,854, 50,199 (Aug. 22, 2014).  In response to the court's injunction, HHS made a "technical correction" to "eliminate provider dissatisfaction as a requirement for Board jurisdiction over appeals based on untimely contractor determinations." *Id*. at 50,200.  "Applicable procedure" for self-disallowance remains missing from the regulation.

### E.    Section 115 of the PRM – HHS's Chameleon

HHS has made section 115 of the PRM the keystone of its renewed self-disallowance regulation and a hurdle to hospitals' statutory appeal rights.  Yet, like a chameleon, PRM section 115 has changed colors, without changing in substance, many times during its history, despite major changes in HHS's reimbursement scheme and its regulations interpreting section 1395oo.

PRM section 115 was issued during, and tailored for, the era of reasonable cost reimbursement and has "not changed since 1980." 73 Fed. Reg. at 30,195 (AR 307).  It was introduced for reasons of "program integrity," to allow providers to claim cost reimbursement for items that are contrary to "regulatory and policy interpretations" without being accused of "fraud and abuse."  *See* The Provider Reimbursement Manual-Part 2, Chapter 1, Cost Reporting – General, No. 15-2, § 115 (2008) ( the "PRM") (attached as Exhibit A); *see also* 73 Fed. Reg. at 30,197-98 (AR 309-10).[3]  As described *supra* at 3, Medicare inpatient reimbursement moved to a prospective payment system in the mid-1980s, during which time HHS's self-disallowance policy was invalidated by *Bethesda*.  PRM section 115 has never been updated to reflect the new prospective payment regime.

PRM section 115 does not include any instruction for self-disallowing regulatory challenges under the prospective payment regime.  In fact, the Board dismissed the Hospitals' appeals for failure to satisfy the following requirements in 2008, "[f]or purposes of IPPS providers, filing a cost report under protest is achieved by entering such costs on Worksheet E, Part A, Line 30 of the cost report."  Board AR 0006.  The Board cited PRM 15-2, § 3630.1, a different section of the PRM with instruction on how to complete Worksheet E of the cost

---

[3] PRM section 115 states that hospitals are "permitted to dispute **regulatory and policy interpretations** through the appeals process established by the Social Security Act."  *See* Exhibit A) (emphasis added).  It then instructs hospitals to "[i]nclude the nonallowable item in the cost report in order to establish an appeal issue, and the disputed item must pertain to the cost reporting period for which the cost report is filed. . ." and "the disputed item and amount for each issue must be **specifically identified in footnotes to the settlement worksheet** and the fact that the cost report is filed under protest must be disclosed." *Id.* at 115 & 115.1 (emphasis added). Further, section 115 requires working papers to demonstrate that reasonable methodology was used to calculate the protested amount. *Id.* at 115.2.  Finally, the failure "to comply with the requirements for filing cost reports under protest as set forth above . . . [will be] referred to the CMS regional office."  *Id.* at 115.3.

report.[4]  Neither the renewed self-disallowance regulation nor the preamble nor section 115 of

the PRM mentions this additional section 3630.1.

## RECORD FACTS

The Hospitals' Medicare appeals substantively challenge HHS's regulations governing

the payment for certain "outlier" cases.  Compl. ¶¶ 6-9, ECF No. 1.  An outlier payment is a

supplemental payment to which a hospital is entitled when it treats a patient case that is

extraordinarily costly (because the patient is extraordinarily ill or frail).  The outlier payment is

made if the hospital's costs (as estimated based on the hospital's billed charges) exceed the

standard Medicare payment by more than a certain dollar amount set annually by HHS and

known as the "fixed loss threshold."  *Banner Health v. Sebelius*, 945 F. Supp. 2d 1, 6 n.1 (D.D.C.

2013).  Without reaching the merits of the Hospitals' underlying challenge to the related

regulations, over which it has no authority, the Board below invoked HHS's renewed self-

disallowance regulation and denied jurisdiction over the Hospitals' appeals.  This final decision

necessitated the Hospitals' present challenge to HHS's self-disallowance regulation as

promulgated and as applied to the Hospitals.

I.    **The Hospitals timely filed, and the Medicare contractors accepted and audited, their**
      **cost reports for their fiscal year ending in 2008, which included all relevant**
      **information as to the costs incurred by the Hospitals as related to outlier**
      **reimbursements**

After the close of their December 31, 2008 fiscal year here at issue, in early 2009, the

Hospitals timely submitted their cost reports to their Medicare contractors.  Each cost report

included the costs incurred by the Hospitals during their fiscal year 2008; such costs were

---

[4] Section 3630.1 instructs hospitals, as to Line 30, to "[e]nter the program reimbursement effect of protested items.  Estimate the reimbursement effect of the nonallowable items by applying reasonable methodology which closely approximates the actual effect of the item as if it had been determined through the normal cost finding process.  (*See* §115.2).  Attach a schedule showing the details and computations for this line."  PRM § 3630.1.

entered upon various schedules and worksheets in the cost reports.  *See*, *e.g.*, Board AR 428-29,

443-44, 454-55, 466-67, 478-79.  Specifically, in each of the cost reports at issue, the Hospitals

claimed all the reimbursement available under HHS's existing outlier rules by including such

information on their outlier claims on Worksheet E Part A, Line 2.01.  *See, e.g.*, *id.*  Further, the

Hospitals did not include their challenge to the validity of the outlier regulations under the

"protested amounts" section of the cost report.  Board AR 007; *see, e.g.,* Board AR 428-29, 443-

44, 454-55, 466-67, 478-79.

The Medicare contractors accepted the Hospitals' cost reports and audited them in

accordance with HHS's regulations and policies.  The Medicare contractors simply applied

existing HHS regulations and policies governing the determination of outlier payments, and paid

accordingly.  CMS, Medicare Claims Processing Manual, Chapter 3 – Inpatient Hospital

Billing,§ 20.1.2.3 (2011).  Accordingly, the Medicare contractors reviewed and adjusted many of

the Hospitals' claims for outlier payments, as identified on Worksheet E Part A, Line 2.01.

Following the audit, some 3-4 years after the cost reports had been filed, the Medicare

contractors issued NPRs, which included adjustments to outlier reimbursement in many

Hospitals' audit adjustment reports.  *See, e.g.*, Board AR 440-41, 451-52, 462-64, 474-76.

II.     **The Hospitals filed timely Board appeals premised on dissatisfaction with their total reimbursement determinations, but the Board dismissed those appeals applying the renewed self-disallowance regulation**

Dissatisfied with their total outlier reimbursements (including their outlier

reimbursement) for 2008, the Hospitals timely appealed their NPRs within 180 days of their

receipt of same.  Board AR009-11.  Following HHS regulations and guidance, the Hospitals

appealed their common challenge to their outlier reimbursements in a single group appeal.

Board AR 759-62.  The Hospitals challenge the validity of HHS's regulations governing their

outlier payments, contending that HHS improperly set the key payment variables, including what is commonly known as the "fixed loss threshold."  Board AR 419-22.

Pursuant to 42 U.S.C. § 1395oo(f) and the applicable regulations, the Hospitals requested expedited judicial review on March 21, 2014.  Board AR 36.  On May 14, 2014, the Board concluded that "as the [Hospitals] failed to protest [*i.e.*, self-disallow] the outlier reimbursement at issue and that is the sole issue involved in these appeals, the Board lacks jurisdiction over the appeals of the [Hospitals]. . . ."  Board AR 007.  The Board's decision relied on the renewed self-disallowance requirement set forth in 42 C.F.R. § 405.1835(a)(1).  *Id.*  According to the Board, the Hospitals had not identified their regulatory challenges on the face of their cost reports, which had been filed from 3 ½ to 4 ½ years before section 1395oo's 180-day deadline triggered by the receipt of the NPR.  Board AR 007. The Board did not find any other alleged jurisdictional defects.

As a result of the Board's findings and order, the Hospitals have been deprived of their statutory right to appeal the number and amount of their outlier reimbursements for their fiscal year ending in 2008.  The Board's decision comprises an appealable final agency action.  Board AR 008.  The Hospitals timely sought judicial review, pursuant to 42 U.S.C. § 1395oo(f).

**III.    HHS failed to disclose key facts at any time before the Hospitals' fiscal year 2008 cost reports were due which facts revealed grounds for challenging HHS's regulations**

A hospital must file its cost report within 5 months after the close of its fiscal year; here, by approximately June 1, 2009.  However, key information relating to the Hospitals' outlier challenges was not disclosed until long after the Hospitals had filed their cost reports.  Specifically, it was not until 2012 that a draft "Interim Final Rule" and two reports by the HHS OIG came to light.  The relevance of these documents is addressed below.

A.      **The Interim Final Rule – discovered in 2012.**

Congress enacted the outlier program, 42 U.S.C. § 1395ww(d)(3) and (5)(A) (the

"Outlier Statute"), when it established the Inpatient Prospective Payment System ("IPPS") in

1983.  HHS is directed to make supplemental "outlier" payments to eligible providers in order to

"insulate hospitals from bearing a disproportionate share of these atypical costs. . . ."  *Cnty. of*

*Los Angeles v. Shalala*, 192 F.3d. 1005, 1009 (D.C. Cir. 1999).  HHS has two sets of regulations

that establish the mathematical models used to determine outlier payments: (1) the regulations

that establish the model for determining whether individual hospital IPPS patient cases qualify

for outlier payments; and (2) the regulations that establish the annual fixed loss threshold, which,

as described, is the cost hurdle that an individual patient case must exceed in order to be eligible

for outlier payments.

HHS first promulgated the payment regulations in 1985 and has since amended them.

Notably, in 2003, HHS overhauled the payment regulations in an effort to fix key vulnerabilities

that had permitted a small number of hospitals to abuse the outlier program and to receive

billions of dollars in otherwise unwarranted outlier reimbursements.  68 Fed. Reg. 34,494,

34,496 (June 9, 2003).  Prior to its 2003 amendments, for more than a decade, HHS redistributed

more than $9 billion from the vast majority of compliant hospitals to these hospitals that were

abusing the system.  In so doing, HHS consistently <u>under</u>paid hospitals that had incurred

extraordinarily high costs in service to the sickest (and most costly to care for) Medicare patients

– the underpayments occurred because HHS hyper-inflated the fixed loss threshold (by 246%

from 1997-2003) for all in an uninformed effort to stem the abusive practices of the small

minority of hospitals.

As the first official action taken in this 2003 rulemaking, the HHS Secretary signed a 60-

page draft "Interim Final Rule," aimed both at fixing the vulnerabilities and immediately

16

lowering the fixed loss threshold so as to bring some relief to the hospitals that had been harmed

for many years by the hyper-inflated threshold.  *See Banner Health*, 945 F. Supp. at 24-25.  In

this Interim Final Rule, HHS proposed to the OMB that the fiscal year 2003 outlier threshold

should be immediately lowered from $33,560 to $20,760.  *Id.* at 25.   The Interim Final Rule also

contained significant alternatives, facts, other data and analyses that HHS considered in the

rulemaking process, but that were directly contrary to its published regulations which ultimately

retained the threshold at $33,650.  *Id.* at 25-26.   Notably, HHS acknowledged in the Interim

Final Rule that the prior spike in thresholds (almost the entire increase of $20,760 to $33,560

from FY 2002 to FY 2003) was due to HHS's uninformed response to the relatively few abusive

hospitals and had caused many truly high-cost cases not to qualify for outlier payments.   HHS

also found that it would be against the public interest to extend the duration of these payment

inequities, thus establishing good cause to implement the Interim Final Rule immediately

without prior notice and comment.  *Id.* at 25.

However, after submitting the Interim Final Rule to OMB, HHS silently rewrote its

notice of proposed rulemaking so as to eliminate all proposals to lower the fixed loss threshold

and any mention of the methodology used to do so, all of which were adverse to its ultimate

published course of action.  *Banner Health*, 945 F. Supp. 2d at 27 ("there can be little doubt that

the Interim Final Rule reflects views adverse to those finally adopted by the Secretary and that

the Secretary considered – and indeed proposed to OMB – the Interim Final Rule as an

alternative in its path to promulgation of the 2003 amended Outlier Payment Regulations now

challenged by Plaintiffs.").   Even by federal fiscal year 2008 (here at issue), the fixed loss

thresholds still had not reached the low $20,000 level proposed in the Interim Final Rule.

Because HHS never published the alternatives, facts, and data as outlined in the Interim Final Rule, the Hospitals did not know of them when they filed their cost reports in the spring of 2009.  The Hospitals did not learn about the Interim Final Rule until they discovered it through a FOIA request in 2012.  *Banner Health v. Burwell*, No. 10-01638 (CKK), 2014 U.S. Dist. LEXIS 91668, at *35 (D.D.C. July 7, 2014).

**B.      In 2012, HHS's OIG issued a report contradicting HHS's published explanation as to reconciliation of outlier payments**

When HHS revised the outlier payment regulations in 2003, it required the audit and reconciliation of outlier payments made to any hospitals meeting certain criteria to catch and correct for any continued excessive charge inflation.  Notwithstanding this reconciliation requirement, and in the face of consistent criticism in public comments, HHS stated that it would not be "making any adjustments for the possibility . . . [of reconciliation] . . . upon cost report settlement" when establishing fixed loss thresholds since FY 2003.  *See, e.g.*, 72 Fed. Reg. 47,130, 47,419 (Aug. 22, 2007) (IPPS FY 2008 Rates).  Each time, HHS recited the same general excuses as to why it would not consider the impact of reconciliation.  For example, in FY 2008, HHS stated:

> We continue to believe that, due to the policy implemented in the outlier final rule (68 FR 34494, June 9, 2003), CCRs will no longer fluctuate significantly and, therefore, few hospitals will actually have these ratios reconciled upon cost report settlement.  In addition, it is difficult to predict the specific hospitals that will have CCRs and outlier payments reconciled in any given year.  We also noted that reconciliation occurs because hospitals' actual CCRs for the cost reporting period are different than the interim CCRs used to calculate outlier payments when a bill is processed.  Our simulations assume that CCRs accurately measure hospital costs based on information available to us at the time we set the outlier threshold.  For these reasons, we are not making any assumptions about the effects of reconciliation on the outlier threshold calculation.

72 Fed. Reg. at 47,419.

On June 28, 2012, however, the HHS Office of Inspector General ("OIG") issued a report with results from its review of HHS's outlier reconciliation process.  Dep't of Health & Human Servs., Office of Inspector Gen., *The Centers for Medicare & Medicaid Services Did Not Reconcile Medicare Outlier Payments in Accordance with Federal Regulations and Guidance*, A-07-10-02764 (June 2012)  (the "2012 OIG Report").[5]  The 2012 OIG Report reveals the inaccuracy of (and the key information omitted from) HHS's stated reasons for not considering the impact of reconciliation, in establishing the FLTs for FYs 2004–2011.  The OIG found (as HHS conceded) that seven years after 2003, the year in which HHS published its regulation requiring reconciliation, HHS had not reconciled any of the cost reports screened and reported up by its contractors.  HHS claimed that this extraordinary delay was because it had not yet been able to develop a methodology for effecting those reconciliations.  *Id.* at 7-8.  The OIG identified $664 million dollars of outlier payments subject to reconciliation.  *Id.* at 9.

The information set forth in the 2012 OIG Report – that HHS had not performed the required reconciliations because it could not and that more than a half billion dollars of payments were subject to reconciliation – is inconsistent with the reasons given, year after year, for not accounting for the effect of reconciliation in setting the annual FLTs (*e.g.*, its impact would be *de minimis*).  This information is central to one of the Hospitals' challenges to HHS's regulations setting the fixed loss thresholds for the federal fiscal years at issue.  However, because the 2012 OIG Report only became available three years after the Hospitals filed their cost reports here at

---

[5] Dep't of Health & Human Servs., Office of Inspector Gen., *The Centers for Medicare & Medicaid Services Did Not Reconcile Medicare Outlier Payments in Accordance with Federal Regulations and Guidance*, A-07-10-02764 (June 2012), *available at* https://oig.hhs.gov/oas/reports/region7/71002764.pdf.

issue, the relevant information was not available for the Hospitals to ascertain whether to include a challenge to the outlier regulations when they filed their cost reports.[6]

## STANDARD OF REVIEW

HHS's statutory interpretation is reviewed under *Chevron*'s familiar two-step analysis. *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984).  In the first step, the court reviews the statute *de novo* to determine whether "Congress has spoken directly to the precise question at issue."  *See Shays v. FEC*, 528 F.3d 914, 919 (D.C. Cir. 2008).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *See Chevron*, 467 U.S. at 842-43.  If the court finds ambiguity, the agency's interpretation of the statute is due deference only if it is "reasonable," under the second step.  *Id.* at 844.

Further, while an agency may enjoy deference in the area of its expertise, it is due no deference in "interpretation of judicial precedent."  *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 959 n.17 (D.C. Cir. 2013) ("[W]e owe no deference to an agency's interpretation of judicial precedent"), *reh'g den'd en banc*, 2013 U.S. App. LEXIS 18566 (D.C. Cir. Sept. 4, 2013).  The Supreme Court holds the ultimate say in statutory interpretation.  *United States  v. Duvall*, 740 F.3d 604, 609 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[O]nce a[n] . . . interpretation has been adopted by the Supreme Court, that same . . . interpretation must be used by lower courts in later cases.").

---

[6] There is still other information that came to light long after the Hospitals filed their cost reports, including another report issued by the HHS OIG in 2013.  This 2013 report reveals that a small number of hospitals, in a number of fiscal years including those here at issue, had received significantly higher portions of outlier payments than other hospitals, based on submitting extraordinarily high charges for certain cases.  Dep't of Health & Human Servs., Office of Inspector Gen., *Medicare Hospital Outlier Payments Warrant Increased Scrutiny* -06-10-00520 (Nov. 2013), *available at* http://oig.hhs.gov/oei/reports/oei-06-10-00520.pdf.

Finally, under the APA, agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

**I.    HHS' Renewed Self-Disallowance Regulation Conflicts With The Plain Language Of The Statute As Interpreted By The Supreme Court in *Bethesda***

This case presents a clear situation where HHS is attempting to do what the Supreme Court has ruled it may not do:  impose a requirement that hospitals first preview any regulatory challenges to their Medicare contractors in order to preserve their statutory right (years later) to raise such challenges before the Board.  In *Bethesda Hospital Association v. Bowen*, the Supreme Court held that hospitals "could claim dissatisfaction, <u>within the meaning of the statute</u>, without incorporating their challenge in the cost reports filed with their fiscal intermediaries," and that, "under <u>this statutory scheme</u>, requiring submission of the regulatory challenge to the fiscal intermediary is quite unnecessary."  485 U.S. 399, 405, 407 (1988) (emphasis added).  HHS's attempt to regulate around *Bethesda* and the statute cannot stand.

**A.    *Bethesda* rejected HHS's effort to impose a requirement that hospitals exhaust regulatory challenges with the Medicare contractor**

The plaintiff hospitals in *Bethesda*, as here, did not present their challenges to HHS regulations in their cost reports, instead waiting until their timely appeals before the Board to do so.  *Id.* at 401-02.  This process comprised the *Bethesda* plaintiffs' "self-disallowance" of costs that were not authorized by the challenged regulations and that would only have been reimbursed if the regulatory challenge were successful  (*i.e.*, the plaintiffs voluntarily did not claim certain

costs on their cost reports, intending later to challenge the applicable regulation that required the Medicare contractor to disallow such costs).  As occurred here, the Board dismissed the *Bethesda* plaintiffs' appeals.  The Board asserted "that a statutory condition to its jurisdiction had not been met, stating that its authority to grant hearings is limited to cases in which the provider is 'dissatisfied with a final determination of the . . . fiscal intermediary,' and reasoning that the petitioners could not be dissatisfied when they had effected a self-disallowance of the claims." *Id.* at 402 (quoting the Board).  On appeal to the district court, the Board's decision was reversed, but that decision was reversed again by the Sixth Circuit.  Thus, the Supreme Court decided the following question:  "whether the Board may decline to consider a provider's challenge to one of the Secretary's regulations on the ground that the provider failed to contest the regulation's validity in the cost report submitted to its fiscal intermediary." *Id.* at 401.

In *Bethesda*, HHS contended that "a provider's right to a hearing before the Board extends only to claims presented to a fiscal intermediary because the provider cannot be 'dissatisfied' with the intermediary's decision to award the amounts requested in the provider's cost report." *Id.* at 404.  The Supreme Court disagreed, holding that "[t]he plain meaning of the statute [§ 1395oo(a)] decides the issue presented." *Id.* at 403.  The Supreme Court held further that "[t]he strained interpretation offered by the Secretary is inconsistent with the express language of the statute." *Id.* at 404.  The statute requires "a provider's dissatisfaction with the amount of its total reimbursement [as] a condition to the Board's jurisdiction." *Id.*  It does not, however, mandate "that a challenge to the validity of a regulation be submitted first to the fiscal intermediary." *Id.*  In fact, "under the statutory scheme, the fiscal intermediary is confined to the mere application of the Secretary's regulations, . . . [and] is without power to award reimbursement except as the regulations provide, and . . . any attempt to persuade the

intermediary to do otherwise would be futile." *Id.*  Hospitals that self-disallow – by not presenting regulatory challenges to the fiscal intermediary – "stand on a different ground than do providers who bypass a clearly prescribed exhaustion requirement or who fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules." *Id.* at 404-05.  Thus, the Supreme Court concluded that the *Bethesda* plaintiffs "could claim dissatisfaction, within the meaning of the statute, without incorporating their challenge in the cost reports filed with their fiscal intermediaries." *Id.* at 405.

Moreover, the Supreme Court held that "[w]hile the express language of subsection (a) requires the result we reach in the present case, our conclusion is also supported by the language and design of the statute as a whole." *Id.*  The Supreme Court reasoned, "[s]ection 1395oo(d), which sets forth the powers and duties of the Board once its jurisdiction has been invoked, explicitly provides that in making its decision whether to affirm, modify, or reverse the intermediary's decision, the Board can 'make any other revisions on matters covered by such cost report . . . even though such matters were not considered by the intermediary in making such final  determination.'" *Id.* at 405-06 (quoting 42 U.S.C. § 1395oo(d)).  "This language allows the Board, once it obtains jurisdiction pursuant to subsection (a), to review and revise a cost report with respect to matters not contested before the fiscal intermediary.  The only limitation prescribed by Congress is that the matter must have been 'covered by such cost report,' that is, a cost or expense that was incurred within the period for which the cost report was filed, even if such cost or expense was not expressly claimed." *Id.* at 406 (quoting 42 U.S.C. § 1395oo(d)).

Further analyzing the statutory scheme and disposing with HHS's final arguments related to same, the Supreme Court provided pertinent analysis on the futility of HHS's protest requirement:

Neither the fiscal intermediary nor the Board has the authority to declare regulations invalid.  It does not follow, however, that the statute treats the two entities alike or that it requires the provider to announce its regulatory challenge at each level; for the Board has a statutory action that the fiscal intermediary does not have. Subsection (f)(1) grants providers the right to obtain judicial review of an action of the fiscal intermediary, but the predicate is that the Board must first make a determination that it is without authority to decide the matter because the provider's claim involves a question of law or regulations.  It is this determination of the Board, or alternatively the Board's failure to act, that triggers the right of judicial review.

The Secretary notes that subsection (f)(1) posits review of an "action of the fiscal intermediary," and argues that without presenting the intermediary with the challenge to the regulation there can be no action to review. The statute provides, however, that the intermediary has no authority to deviate from the rules and regulations and that the Board, not the fiscal intermediary, is to make the determination that it lacks the requisite authority to consider the validity of the regulation. Under this statutory scheme, requiring submission of the regulatory challenge to the fiscal intermediary is quite unnecessary. The Board has a role in shaping the controversy that is subject to judicial review; the fiscal intermediary does not.

Finally, the Secretary's proffered requirement of notice to the fiscal intermediary is internally inconsistent. The Secretary cannot maintain, on the one hand, that it is of vital importance to present challenges to the Secretary's regulations in the first instance to the fiscal intermediary and, on the other, acknowledge that a mere cover letter would suffice because the fiscal intermediary lacks authority to rule on the challenge. By objecting to the regulation in the first instance in proceedings before the Board, the petitioners protected their right to judicial review.

*Id.* at 406-08 (footnotes omitted).

Thus, the Supreme Court soundly rejected HHS's self-disallowance policy in *Bethesda*, holding that the statute did not require, and HHS could not impose, a futile requirement to exhaust regulatory challenges with the Medicare contractor.

**B.      HHS's renewed self-disallowance policy is an invalid attempt to overrule**
**        *Bethesda* and violates the statute for the same reasons as HHS's prior policy**

HHS has adopted its renewed self-disallowance regulation, effective for all cost reporting periods ending on or after December 31, 2008.  The renewed self-disallowance regulation is equally invalid, because it is premised on a misreading of *Bethesda,* and relies on virtually the same policy foundation and statutory interpretation the Supreme Court rejected.

First, HHS mistakenly asserts that *Bethesda* "[s]pecifically recognized that the Secretary could impose an exhaustion requirement by regulation . . . ."  73 Fed. Reg. at 30,196 (AR 308). *Bethesda* held no such thing.  In *dictum*, *Bethesda* noted that dissatisfaction might not lie as a factual matter where "providers . . . bypass a clearly prescribed exhaustion requirement or . . . fail to request from the intermediary reimbursement for all costs to which they are entitled under applicable rules."  485 U.S. at 405.  That *dictum* cannot be read as sanctioning a requirement to exhaust <u>regulatory challenges</u>.  To the contrary, *Bethesda* held that the express language of the statute prevented HHS from imposing a requirement that hospitals preview regulatory challenges with their Medicare contractors in order to preserve the right to present such appeals to the Board.  *Bethesda*, thus, addressed the exact circumstances of the instant case.

Further, the Supreme Court's analysis on the futility of HHS's protest requirement for a regulatory challenge is binding.  As under the pre-*Bethesda* statutory scheme, "requiring submission of the regulatory challenge to the [Medicare contractor] is quite unnecessary.  The Board has a role in shaping the controversy that is subject to judicial review; the [Medicare contractor] does not."  *Id.* at 407.  *Bethesda*'s dictum that a provider might not be able to show "dissatisfaction" if it fails to claim "all costs to which [it is] entitled under applicable rules" is irrelevant here.  *Id.* at 405.  The instant case involves "self-disallowed" items, based on regulatory challenges, for which any exhaustion efforts with the Medicare contractors would

have been "futile."  This case does not present the situation where a hospital has failed to present to the Medicare contractor a claim for costs that were payable under HHS regulations.  Thus, the Hospitals here have met all of the statutory requirements for exhaustion by asserting their regulatory challenges (and thus their dissatisfaction with their total amount of program reimbursement) with the Board.

Next, HHS interprets section 1395oo(a)(1) "to mean that a provider is not 'dissatisfied' with a final determination of the intermediary or the Secretary regarding any matter that is omitted from the cost report, and that, as a result, the Board does not have jurisdiction to hear an appeal regarding the matter."  *See* 73 Fed. Reg. at 30,196 (AR 308).  This is the exact interpretation that HHS advanced in *Bethesda* and that the Supreme Court rejected.  *Bethesda,* 485 U.S. at 404.  Moreover, whatever logic this interpretation might have when applied to instances where a hospital fails to claim entitlement to payments that the Medicare contractor is *authorized* to approve (because they are payable under HHS's existing regulations), it has none when applied to regulatory challenges.  In the latter context, as the Supreme Court noted, the Medicare contractor lacks the authority to address the regulatory challenge.  *Id.* at 407.

HHS also invalidly asserts that there is "nothing in the statute indicating that the Secretary cannot interpret the dissatisfaction requirement" to apply to "each specific item" of reimbursement and that it is "completely reasonable" to do so because the "total program reimbursement" is the sum of "many individual calculations . . . ."  *See* 73 Fed. Reg. at 30,197 (AR 309).  To the contrary, the statute expressly states that a hospital must be "dissatisfied with the *amount of total program reimbursement*." 42 U.S.C. § 1395oo(a)(1).  To adopt HHS's interpretation would render the word "total" nugatory.  Such a statutory interpretation must be avoided.  *Nichols v. Bd. of Trustees of The Asbestos Workers Local 24 Pension Plan*, 835 F.2d

881, 893 n.86 (D.C. Cir. 1987) ("Our duty to construe statutes, when possible, without rendering any term nugatory or ineffective, but rather by according reasonable meaning to each part, also demands disapproval of [agency's] statutory interpretation.") (internal citations omitted).

Addressing this exact argument advanced by HHS in a prior case, The Honorable Emmet G. Sullivan held, "The Court is not persuaded to interpret the statute to grant a hearing based upon a provider's expressed dissatisfaction with *individual* reimbursement determinations when the plain language clearly predicates the Board's jurisdiction on a provider's dissatisfaction with the 'amount of *total* program reimbursement.'" *UMDNJ-Univ. Hosp. v. Leavitt*, 539 F. Supp.2d 70, 77 (D.D.C. 2008) (emphasis original). The Ninth Circuit reached the same conclusion: "Section 1395oo(a) does *not* say that a hearing may be obtained . . . 'if a provider is dissatisfied with a final determination of its intermediary as to the amount of reimbursement due on each claim'-- which the statute would do, in sum or substance, if the Secretary's interpretation were plausible." *Loma Linda Univ.Med.Ctr. v. Leavitt*, 492 F.3d 1065, 1070-71 (9th Cir. 2007) (emphasis original).

Moreover, HHS's interpretation effectively eliminates the 180-day statutory timeline for provider appeals that assert regulatory challenges. By requiring hospitals to submit their regulatory challenges first to their Medicare contractors (so as to preserve their right to raise such challenges later with the Board) HHS is effectively setting the deadline for appeals years before the NPR is received, rather than the statutorily prescribed 180 days *after* the NPR is received.[7] This is yet another reason that HHS's interpretation conflicts with the plain language of section 1395oo and is due no deference.

---

[7] In fact, in recent years, it has taken as long as 4-5 years for an NPR to be issued and, thus, HHS's renewed self-disallowance regulation would set the appeal deadline 4 ½ to 5 ½ years earlier than the statute permits.

In summary, HHS's self-disallowance regulation suffers from the same fatal defects as its prior policy, ruled invalid in *Bethesda*.  Based on the clear statutory directive set forth in 42 U.S.C. § 1395oo(a), HHS's interpretation deserves no deference.  *See UMDNJ-Univ. Hosp.*, 539 F. Supp. 2d at 78 (citing *Chevron U.S.A. Inc.* 467 U.S. at 843-45).

## II.     HHS's Interpretation Is Also Unreasonable Under *Chevron* Step Two

Not only does HHS's renewed self-disallowance regulation conflict with the unambiguous language of the statute under *Chevron* step one, but the regulation also fails under *Chevron* step two analysis.  *See Chevron*, 467 U.S. at 843 (holding that an agency's statutory interpretation must be set aside if it is not "based on a permissible construction of the statute.").  At *Chevron* step two, "courts must reject administrative constructions of a statute that frustrate the policy that Congress sought to implement."  *Shays*, 528 F.3d at 925 (internal citations omitted).  Here, that policy is clear: Congress enacted section 1395oo to correct the previous absence of an express administrative and judicial appeal process, not to put futile barriers in a hospital's path to challenging a Medicare regulation.  *See supra* at 23-24.

HHS's 2008 self-disallowance regulation is not a reasonable accommodation that Congress would have sanctioned.  To the contrary, it frustrates congressional intent.  *See Shays*, 528 F.3d at 924-25, 927.  There is no evidence that Congress intended that Medicare contractors would be the initial reviewer of a hospital's challenge to an HHS regulation.  As the Supreme Court held in *Bethesda*, section 1395oo provides that "[t]he Board has a role in shaping the controversy that is subject to judicial review; the [Medicare contractor] fiscal intermediary does not."  485 U.S. at 407.  Instead, Congress granted the Board the power to determine whether "it is without authority to decide the matter because the provider's claim involves a question of law or regulations.  It is this determination of the Board, or alternatively the Board's failure to act, that triggers the right of judicial review."  *Id.* at 406-07 (citing 42 U.S.C. § 1395oo(f)(1)).

Any doubt relating to Congress's goal of expanding hospitals' rights to Board and judicial review under section 1395oo is erased by section 1395oo(d).  This provision grants the Board the authority "to make any other revisions on matters covered by such cost report. . . even though such matters were not considered by the [Medicare contractor] in making its final determination."  42 U.S.C. § 1395oo(d).  This subsection of the statute is consistent with the rest of section 1395oo's grant of authority to the Board in a manner that <u>increases</u> a hospital's ability to seek review of disputes relating to its total amount of Medicare reimbursement.  HHS's renewed self-disallowance regulation, by imposing a futile requirement constricting a hospital's ability to seek such review, contravenes Congressional intent, and fails under *Chevron* step two.

## III.  The Self-Disallowance Regulation Is Arbitrary and Capricious

HHS asserts several "policy" reasons for its renewed self-disallowance regulation, including that the requirement: (1) channels disputes in the first instance to the Medicare contractor rather than to an appellate Board; (2) "allows the Medicare program to estimate better its potential liabilities and to issue changes or clarifications to its policies" and "allows intermediaries to estimate better their workload and audit priorities;" and (3) eliminates the possibility that the  Board will have to "adjudicat[e] disputes as to whether an omitted cost is or is not [payable under current] Medicare payment policy."  *See* 73 Fed. Reg. at 30,196-98 (AR 308-310).  In sum, these so-called requirements merely amount to an argument for administrative convenience, and simply fail as a rationale for abridging the statutory appeal rights of the Hospitals.  Moreover, none of these requirements has any merit when applied to regulatory challenges.  Finally, the peripatetic journey of HHS's evolving interpretation of "dissatisfaction" is itself another reason that the renewed self-disallowance regulation deserves no deference.

A.      **Medicare contractors have no authority to address regulatory challenges, so it serves no purpose of administrative exhaustion to preview such challenges with them**

HHS asserts that the self-disallowance regulation "has a sound policy basis" because, otherwise, "the Board would be required to assume responsibilities that are more appropriately borne by fiscal intermediaries rather than by a 'review' board." 73 Fed. Reg. at 30,197 (AR 309). This is nonsensical when applied to regulatory challenges.

Disputing the validity of HHS's outlier regulations with the Medicare contractor would not have enhanced the contractor's role in the statutorily prescribed administrative appeal scheme and would have achieved nothing. The Medicare contractor is bound by HHS's regulations and could not have granted the relief sought. *See Bethesda*, 485 U.S. at 404. Thus, presenting regulatory challenges to the Medicare contractor, to give it the chance to weigh in on the issue, would not advance any exhaustion of remedies principles and would be futile. *Id.*

Instead, in the statutorily prescribed administrative appeal scheme, regulatory challenges are properly addressed to the Board (under the provisions for expedited judicial review) to determine that it has jurisdiction, but lacks authority, to address the regulatory challenge and, thus, to grant expedited judicial review. 42 U.S.C. § 1395oo(f)(1). Regulatory challenges have no place in the initial filing of the cost report, which is merely the hospital's submission of its request for payment for services rendered in accordance with the existing regulations.

This case does not involve the cost report treatment of any costs with respect to which the Medicare contractor has any discretion. Those costs have been presented to the Medicare contractor and have been audited and adjusted. *See supra* at 13-14. Instead, this case involves HHS's formula for computing outlier payments, a formula controlled by HHS's regulations and which the Medicare contactor is obligated to apply.

Where regulations (such as the outlier regulations) result in what a hospital believes is an underpayment by HHS, there is no dispute with the Medicare contractor. The dispute is with HHS and its policies, as implemented by regulation, an issue reserved for the court. The Board's role is that of a gatekeeper regarding jurisdiction and expedited judicial review, and the Medicare contractor has no role. *See Bethesda*, 485 U.S. at 407-08. In that context, it is specious to assert, as HHS does, that the hospital cannot be dissatisfied unless it demands from the Medicare contractor that which it is powerless to give and, thus, cannot determine.

> **B.    HHS's renewed self-disallowance policy regarding regulatory challenges, by definition, serves no other administrative purpose because Medicare contractors have no duty even to glance at self-disallowed claims presented**

HHS argues that requiring hospitals to preview self-disallowed claims premised on regulatory challenges with the Medicare contractor "allows the Medicare program to estimate better its potential liabilities and to issue changes or clarifications to its policies, and allows intermediaries to estimate better their workload and audit priorities." 73 Fed. Reg. at 30,198 (AR 310). However, this proffered rationale is eviscerated by the fact that "intermediaries are not required to review each protested cost or item to decide to remove or allow that cost or item." *Id.* "Whereas, at one time, items appearing on the protested amount line were 'above the line' (that is, they appeared before, and made up part of, the total claim for reimbursement), that is no longer the case. On the current cost report, the protested amount appears 'below the line' and is not included in the provider's total claim for reimbursement." *Id.* Indeed, the contractor is not required to "audit the self-disallowed item" at any time prior to a Board appeal. Such audits are delayed until <u>after</u> a court rules on the regulatory issue, so "the intermediary [is not] spending resources to determine an amount for an item that, under Medicare policy, would not be awarded." 73 Fed. Reg. at 30,199 (AR 311).

Given that a Medicare contractor's preview of a regulatory challenge would effectively collect dust until after the challenge has first been reviewed by the Board (for purposes of expedited judicial review) and then by a court (on the merits), such a preview cannot serve any real administrative purpose.  As such, HHS's explanation is "internally inconsistent" which, in part, also doomed its previous self-disallowance policy.  *See Bethesda*, 485 U.S. at 408 ("the Secretary's proffered requirement of notice to the fiscal intermediary is internally inconsistent. The Secretary cannot maintain, on the one hand, that it is of vital importance to present challenges to the Secretary's regulations in the first instance to the fiscal intermediary and, on the other, acknowledge that a mere cover letter would suffice because the fiscal intermediary lacks authority to rule on the challenge.").

**C.**     **That the Board may have to "adjudicat[e] disputes as to whether an omitted cost is or is not [payable under current] Medicare payment policy" is consistent with its role and does not support the self-disallowance policy**

HHS also tries to justify its self-disallowance policy on the basis that it will eliminate one form of dispute for the Board to decide:  "if we were to adopt a policy that providers have to list on their cost reports only those items that they believe are in accord with Medicare payment policy, the Board would be required to continue adjudicating disputes as to whether an omitted cost is or is not in accord with Medicare payment policy (because if the omitted cost were in accord with Medicare payment policy, the provider would not have the right to a hearing)."  73 Fed. Reg. at 30,198 (AR 310).  This rationale is flawed for several reasons.

First, HHS incorrectly concludes that it is authorized to restrict Board jurisdiction where a provider fails to claim costs allowable under Medicare policy.  Although that issue is not presented here, the majority of circuits deciding the issue have rejected HHS's interpretation, just as Judge Sullivan has done in the *UMDNJ* case.  *Compare Loma Linda Univ. Med. Ctr. v. Leavitt*, 492 F.3d at 1070-71 (9th Cir. 2007) (rejecting HHS's self-disallowance requirement

with respect to costs awardable under existing regulations and policy); *MaineGeneral Med. Ctr. v. Shalala*, 205 F.3d 493, 500 (1st Cir. 2000) (same); *UMDNJ-Univ. Hosp.*,539 F. Supp.2d at 78 (same), *with Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala*, 165 F.3d 1162, 1165-66 (7th Cir. 1999) (holding that intermediaries must get the first shot).

Further, the fact that the Board will have to decide a jurisdictional question is not a valid reason to take the question off the table entirely.  Resolving jurisdictional questions is directly within the Board's ambit under the statutory and regulatory scheme.  *See* 42 U.S.C. § 1395oo(f). If the Board were to determine that a cost not claimed was, in fact, payable "in accord with Medicare payment policy," this would not add to the Board's duties as there would be no hearing on such omitted costs.

### D.    HHS's failure to explain its flip flopping interpretations of section 1395oo, both before and after 2008, demonstrates the arbitrary and capricious nature of its 2008 interpretation

Because the language of the statute is clear, as the Supreme Court has declared, there is no need even to consider whether HHS's reversal in policy, in 2008, constitutes an arbitrary and capricious change.  However, a brief examination of HHS's explanations, or lack thereof, for its seriously inconsistent attempts to rationalize its self-disallowance policies shows that its 2008 interpretation is arbitrary and capricious.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-16 (2009).  A "well explained" agency change in policy or interpretation may be sustainable if "the new policy is permissible under the statute, . . . there are good reasons for it, and . . . the agency believes it to be better."  *Id*. at 503.  HHS fails here because its renewed self-disallowance regulation is again devoid of any rational explanation for resurrecting, after 20 years, the requirement that hospitals take futile steps on the path to satisfying section 1395oo's well established and unambiguous requirements for invoking the Board's jurisdiction.

The only rationale that HHS offered in its notice of proposed rulemaking for the renewed self-disallowance regulation was "[w]e believe it is appropriate to codify our policy in regulations . . . ." 69 Fed. Reg. at 35,722 (AR 008).  However, HHS also acknowledged that, after *Bethesda*, HHS had "no longer required providers to claim items for which the [Medicare contractor] did not have the discretion to award payment due to a regulation or manual provision (See former Appendix A, § B.1. of the Provider Reimbursement Manual (PRM))."  *Id.*  Thus, to "codify [existing] policy" cannot serve as a purported rationale for HHS's reintroduction of the pre-*Bethesda* requirement that hospitals note regulatory challenges on their cost reports, as pre-existing policy was the opposite.

The explanation given by HHS in promulgating the final regulation fares no better.  In the preamble, HHS tries to sidestep *Bethesda*'s holding, focusing instead on its *dictum* as allegedly sanctioning its renewed self-disallowance regulation.  This effort fails as HHS does not acknowledge the distinction between regulatory challenges (over which Medicare contractors have no authority) and permissible costs (which Medicare contractors may award).  *See supra* at 25-26.  HHS also pointed to several post-*Bethesda* circuit court decisions addressing whether HHS could validly deny jurisdiction where a hospital failed to include *permissible* reimbursable items in the cost report.  73 Fed. Reg. at 30,196-97 (AR 308-09).  Although HHS claimed "[i]t has been [its] longstanding view that providers that fail to claim on their cost reports costs that are allowable under the Medicare law and regulations cannot meet the 'dissatisfaction' requirement," 73 Fed. Reg. at 30,196 (AR 308), the same cannot be said of HHS's interpretation of dissatisfaction as applied to costs <u>not</u> allowable under existing regulations.[8]  HHS's policy as

---

[8] HHS also relies on its "longstanding instructions contain[ed] in section 115 of the PRM, Part II."  73 Fed. Reg. at 30,197 (AR 309).  However, as shown *supra* at 11-12, section 115 of the PRM was published in 1980, during the era of reasonable cost reimbursement, for the purpose of

to allowable costs does not support its renewed self-disallowance regulation for challenges to regulations (and related non-allowable costs).

Indeed, the only potentially applicable explanation offered in the preamble is HHS's general desire to lower the number of pending Board appeals by adding procedural hurdles for providers.  This goal, however, does not justify an agency abridgment of statutory appeal rights.  Finally, to the extent HHS attempts to justify such a change on policy grounds, it fails for the reasons discussed *supra* at 30-33.  Thus, at the time it promulgated the renewed self-disallowance regulation, HHS offered no apt explanation, much less a reasonable explanation, for abandoning its post-*Bethesda* position and re-imposing a requirement that the Supreme Court has already determined to be contrary to the plain meaning of the statute.

HHS's rationales given at the time it promulgated the renewed self-disallowance regulation are further belied by its actions since 2008 in interpreting section 1395oo.  First, as previously summarized, HHS abandoned half of its self-disallowance regulation, as applied to appeals filed on the basis of untimely NPRs, when providers challenged this portion of the rule in court.  *See supra* at 9-10.  Then, acting in a manner contrary to its binding concession in court, HHS once again proposed to change the justification for its self-disallowance regulation in 2014, this time abandoning its reliance on the "dissatisfaction" language under section 1395oo, upon which it had relied for more than 25 years.  Instead, HHS proposed (only later to change its mind again and abandon its proposal) to justify the same self-disallowance requirement as a necessary element of filing a "complete" cost-report.  *See supra* at 10-11.

---

protecting hospitals from being charged with submitting false claims where they wanted to claim cost reimbursement to which they might or might not be entitled.

### E.   HHS's renewed self-disallowance regulation invalidly requires hospitals to act on the basis of incomplete information

Whether one calls it an impermissible interpretation of the statute at *Chevron* step one, an unreasonable interpretation or application of the statute at *Chevron* step two, or an unreasonable exercise of agency discretion under *State Farm*, one key point is the same:  it is unreasonable for HHS to require providers to foresee the future, *i.e.*, to disclose and detail the basis for all challenges to agency regulations 4 ½ to 5 ½  years before the statute requires such appeals to be filed with the Board.

During the notice and comment period, commenters pointed out that "Providers have to trust the information with which they are provided when preparing cost reports. . . and Providers should not be held responsible for discovering errors made by government bodies."  73 Fed. Reg. at 30,198 (AR 310).  Another commenter concluded that "there is no basis in law or equity for CMS's attempt to cut off providers' appeal rights because the providers may not recognize the invalidity of a particular intermediary's interpretation of CMS's regulation and policies at the time they filed their cost reports."  *Id.*  These comments are directed at the fact that HHS's requirement that providers self-disallow any cost related to challenges to reimbursement regulations wrongly presumes that, within 5 months after the close of their fiscal year, providers possess all requisite facts with which to determine whether a particular regulation should be challenged.  This is often not the case, and HHS's response is, at best, naïve: "We do not believe that there should be any significant difficulty for providers in identifying items for which they believe they should receive payment in derogation of Medicare payment policy. "  *Id.*  Just one recent case proves HHS's "belief" is unfounded.

In 2011, the D.C. Circuit vacated certain HHS regulations governing hospital payments in federal fiscal years 2007 and 2008, *i.e.*, the regulations were vacated three and four years,

respectively, after the time periods to which the regulations applied.  *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 215-17 (D.C. Cir. 2011).  The regulations set a statutorily directed payment adjustment factor, known as the "rural floor budget neutrality adjustment factor," which directly impacted the reimbursement rate for all inpatient treatment.  *Id.*  HHS's process for setting the adjustment factor was opaque, and an outside consultant only learned, through an informal email exchange with HHS, that the agency had been miscalculating the adjustment factor to the detriment of all hospitals.  *Id.* at 207.  The D.C. Circuit vacated HHS's 2007 and 2008 regulations and remanded to HHS, in part, "either to explain why reversing all prior rural-floor budget-neutrality adjustments was unnecessary to achieve budget neutrality in 2008 or . . . to recalculate the payments due the hospitals under a formula that removes the effects of the prior rural-floor budget-neutrality adjustments."  *Id.* at 216.

Another full year passed after the *Cape Cod* decision before hospitals learned that no additional explanation would be forthcoming from HHS on remand and that, instead, HHS might be recalculating the adjustment factor.[9]  Further, HHS took the position in the Federal Register that, although it was fixing the errors in its calculation of the adjustment factor in FY 2012 going forward, it would <u>not</u> cure its past mistakes, leaving hospitals short of billions of dollars in reimbursement.  76 Fed. Reg. 51,476, 51,788 (Aug. 18, 2011).

This refusal to correct forced hospitals to pursue appeals with the Board in order to seek the reimbursement monies of which they had been deprived due to HHS's math errors. However, HHS's mistakes impacted reimbursements applicable to hospital cost reporting periods

---

[9] In April 2012, HHS entered into a $700 million settlement agreement with roughly 500 hospitals to compensate for underpayments "related to an error in Medicare's 'rural floor' budget neutrality adjustment for fiscal years 1999 through 2011." Am. Hosp. Ass'n, *Hospitals Settle Medicare Rural Floor Case with HHS*, AHA News (April 13, 2012), http://news.aha.org/article/hospitals-settle-medicare-rural-floor-case-with-hhs.

ending on or after December 31, 2008.[10]  The Board dismissed many appeals because the

hospitals had not presciently self-disallowed the rural floor budget neutrality issue in their cost

reports filed in 2009, years before it became clear that HHS had been making cumulative errors

for over a decade.  *See, e.g.,* Complaint at 44, Charleston Area Med. Ctr. v. Sebelius, No. 1:13-

cv-00766-RMC (D.D.C. May 24, 2013), ECF No. 1.[11]  No court has had a chance to review the

renewed self-disallowance regulation as applied against faultless providers who could not have

known these errors when they filed their cost reports.  This is because HHS would not defend

these cases in court and subsequently settled them.  *See, e.g.*, Stipulation of Dismissal with

Prejudice, Charleston Area Med. Ctr. v. Sebelius, No. 1:13-cv-00766-RMC (D.D.C. Dec. 22,

2014), ECF No. 36.   However, HHS cannot erase the fact that the self-disallowance regulation is

inherently flawed in its assumption that providers have all necessary information to present self-

disallowed regulatory claims when filing a cost report.

In the case of the outlier reimbursements, key information was unavailable when the

Hospitals submitted their cost reports for FY 2008.  *See supra* at 15-19.  Both the Interim Final

Rule and the OIG Reports were unavailable in the spring of 2009.  Thus, the Hospitals did not

have all the facts necessary to determine whether to "self-disallow" outlier claims based on a

regulatory challenge at the time they were required to file their cost reports.

---

[10] In fact, HHS's mistakes, finally determined in 2011, have adversely impacted reimbursement
for all fiscal years from 1999 to and through 2011.  *See supra* n.9.

[11] Thus, it is self-serving, at best, for HHS to promulgate a regulation that abridges statutory
appeal rights and that serves to protect HHS from its own mistakes.  It was decades ago that
Congress determined to waive sovereign immunity from the obligation to pay hospitals for the
services they provide to Medicare beneficiaries.

**IV.    HHS's Self-Disallowance Regulation Violates The APA's Procedural Requirements Concerning Incorporation By Reference**

The APA imposes two publication requirements in keeping with the general commitment to public notice and participation.  First, section 552 requires an agency to state and to publish in the Federal Register substantive rules of general applicability.  5 U.S.C. § 552(a)(1).[12]  Further, an agency must also provide commenters "the opportunity to comment on a significant part of the agency's decisionmaking process as required by section 553."  *PPG Indus., Inc. v. Costle*, 659 F.2d 1239, 1250 (D.C. Cir. 1981) (describing the opportunity to comment as one of "the more fundamental purposes of the APA's publication requirements. . . .").  HHS failed both of these requirements when it mandated compliance with "applicable procedures for filing a cost report under protest," 42 C.F.R. § 405.1835(a)(1)(ii) (2008), but did not set forth any such procedures in the regulation or the Federal Register.

Section 552 requires HHS to "separately state and currently publish in the Federal Register for the guidance of the public --:

> (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency.
>
> . . .
>
> Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.  For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

---

[12] Though 5 U.S.C. § 552 is best known as the Freedom of Information Act, failure to adhere to the publication requirements under § 552(a) is an APA violation.  *Cf. Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538-39 (D.C. Cir. 1986).

5 U.S.C. § 552(a)(1).[13]  Similarly, section 553 (b)(3) states that "[g]eneral notice of proposed

rule making shall be published in the Federal Register . . . .  The notice shall include – . . . (3)

either the terms or substance of the proposed rule or a description of the subjects and issues

involved."  5 U.S.C. § 553(b).  Accordingly, "[i]f a required definition or procedure is part of a

rule, it must be published or incorporated by reference in the Federal Register."  *PPG Indus.,*

*Inc.*, 659 F.2d at 1250; *see also Appalachian Power Co. v. EPA*, 566 F.2d 451, 455 (4th Cir.

1977) ("Any agency regulation that so directly affects pre-existing legal rights or obligations,

indeed, that is of such a nature that knowledge of it is needed to keep the outside interests

informed of the agency's requirements in respect to any subject within its competence, is within

the publication requirement.") (emphasis added) (internal citations and quotations omitted).

Here, the renewed self-disallowance regulation imposes mandatory obligations upon

hospitals to follow "applicable procedures for filing a cost report under protest."  42 C.F.R. §

405.1835(a)(1)(ii) (2008).  Indeed, the Board here dismissed the Hospitals' appeals based on

their failure to follow such procedures.  Board AR 7.  The mandatory nature of this requirement

renders these "applicable procedures" a set of substantive rules of general applicability.  *PPG*

*Indus., Inc.*, 659 F.2d at 1249-50; *see also Appalachian Power Co.*, 566 F.2d at 455.  Thus, the

publication requirements under the APA apply to such "applicable procedures."

Yet, the "applicable procedures" are not contained in either the regulations or the

preambles.  Instead, the preambles, in a passing reference, direct readers to section 115 of the

PRM.  69 Fed. Reg. at 35,722 (AR 8) ( "In order to self-disallow an item, the provider would be

required to follow the applicable procedures for filing a cost report under protest, which are

contained currently in § 115 of the PRM, Part 2 (CMS Pub. 15–2).");  73 Fed. Reg. at 30,195,

---

[13] The Director of the Federal Register has issued regulations governing the process for
obtaining approval for incorporation by reference.  *See* 1 C.F.R. §§ 51.1(e), 51.5, 51.7(b), 51.9.

30,197-98 (AR 307, 309-10) (same).  As the Board decisions at issue admit, HHS essentially

attempted "to incorporate PRM 15-2, § 115 *et seq*. into the regulations  . . . ."  Board AR 4-5; *see*

*also* 73 Fed. Reg. at 30,195 (AR 307) (stating HHS's regulation was "essentially a codification

of the protested amount line procedures set forth in section 115 *et seq*. of the PRM, Part II. . . .").

However, incorporation by reference, or "codification," is governed by section 552 of the APA.

As such, HHS should have either included the "applicable procedures" in the Federal Register or

sought "the approval of the Director of the Federal Register" for incorporation by reference.  5

U.S.C. § 552(a)(1).  HHS failed to do either.

Notably, after the instant case was filed, HHS proposed to amend its renewed self-

disallowance regulation, in part, to include the "applicable procedures" in the text of the actual

regulations.  79 Fed. Reg. at 28,209 (proposed May 15, 2014) (proposing yet again to change the

self-disallowance requirement, this time as an element of cost reporting, not as a part of

demonstrating "dissatisfaction" under 42 U.S.C. § 1395oo(a), as HHS had justified the 2008

Self-Disallowance Regulation).[14]  This proposal, though not finalized, 79 Fed. Reg. at 50,199

(Aug. 22, 2014), stands in sharp contrast to HHS's non-compliant self-disallowance regulation

promulgated in 2008.

Further, HHS's failure to publish goes to the adequacy of the agency's notice, as required

under 5 U.S.C. § 553(b)(3).  The renewed self-disallowance regulation, as promulgated and

lacking the procedures for self-disallowing challenges to regulations, is extremely unclear as to

what hospitals must do to comply with the requirement.  This fails the "more fundamental

purposes of the APA's publication requirements [because] it [did] not provide [commenters] the

---

[14] *See supra* at 11-12.

opportunity to comment on a significant part of the agency's decisionmaking process as required by section 553." *PPG Indus. Inc.*, 659 F.2d at 1250.

The D.C. Circuit's analysis of a similarly invalid agency rulemaking is instructive.  In *PPG Industries*, the Environmental Protection Agency ("EPA") attempted to incorporate into a regulation the content of a guideline document, which contained details for a new process by which the EPA would measure a pollutant, by citing to the guideline document in a footnote in an appendix to the Federal Register.  *Id.* at 1245.  The D.C. Circuit found that EPA's notice "did not fully meet the APA's notice requirement.  In one particular, the rule itself, without the Guidelines, is extremely unclear." *Id.* at 1249 (referring to the notice requirements under 5 U.S.C. § 553(b)(3)).  Further, EPA's failure either to publish or to incorporate properly by reference the regulatory process itself in the Federal Register violated 5 U.S.C. § 522, despite "intend[ing] the Guidelines' procedure to be made mandatory by means of the rule." *Id.* at 1249-50.  As a result, "[Plaintiffs] may not in any manner be required to resort to, or be adversely affected by such unpublished materials.  5 U.S.C. § 552(a)(1).  In short, the [applicable procedures] referred to in [the Regulation] are without legal effect." *Id.* at 1250.

Finally, the exemption under the APA's publication and notice requirements where there is actual notice of regulatory requirements does not apply here.  The hospitals had no actual notice of the "applicable procedures."  While the proposed regulation did reference PRM section 115,  that section remains unchanged since its days as a mechanism to ensure "program integrity" during the cost reimbursement era and, importantly, does not set forth any specific procedures for prospective payment regulatory challenges.  *See supra* at 11-12.  The requirements set forth in the PRM had not previously been associated with a hospital's statutory right to appeal claims for payment based on challenges to existing HHS regulations.

PRM section 115 does not, on its face, apply to a situation where providers are challenging the validity of a prospective payment reimbursement regulation.  Indeed, the particulars as to how to self-disallow did not come until the Board, reviewing these appeals, mandated that Hospitals enter protested costs "on Worksheet E, Part A, Line 30 of the cost report."  Board AR 0006 (citing to PRM 15-2, § 3630.1).  Whereas the Board based its dismissal on the instructions provided in section 3630.1 of the PRM, neither the renewed self-disallowance regulation nor the preamble nor section 115 of the PRM mentioned this additional section of the PRM.  *See supra* at 11-12.  Thus, the instructions that HHS sought to incorporate by reference failed to provide notice of HHS's requirements.

## V.     Remand Is Not Necessary Because the Board Granted Expedited Judicial Review For Other Hospitals In the Same Group Appeal On the Same Substantive Challenge

Upon invalidation of HHS's renewed self-disallowance regulation, there is no need for a remand to the Board to determine the Hospitals' requests for expedited judicial review ("EJR"). In identical circumstances, The Honorable  Rosemary M. Collyer ordered (with the consent of HHS), that plaintiffs be permitted to file an amended complaint pleading their substantive outlier claims following issuance of an injunction invaliding another part of the self-disallowance regulation.  *See, e.g.*, Order at 2, *Lee Mem'l*, No. 1:13-cv-00643 (D.D.C. Aug. 6, 2014), ECF No. 40; *see also supra* at 9-10.  Judge Collyer found that the Board had jurisdiction over, but no authority to decide, the Hospitals' appeals.  *Id.*  The Court here should find similarly, as the Board already granted EJR to several other hospitals in the same group appeal, concluding that it had no authority to decide their outlier challenges.  Board AR 012.  Accordingly, this Court has subject matter jurisdiction over the merits of the Hospitals' outlier payment claims based on the EJR provisions of the Medicare statute, 42 U.S.C. § 1395oo(f)(1).

**CONCLUSION**

For the foregoing reasons, the Hospitals respectfully request that this Court enter an order holding (a) that HHS's renewed self-disallowance regulation, as applied to challenges to HHS's regulations, is invalid, (b) that the Hospitals' appeals satisfy all of the jurisdictional requirements of section 1395oo, (c) that there is no need to remand to the Board because it has no authority to hear the merits of the Hospitals' substantive claims,  and (d) that the Hospitals shall be permitted to file an amended complaint pleading their substantive claims within 20 days after the Court's order.

Date: June 1, 2015

Respectfully submitted,

*s/ Stephen Nash*
Stephen Nash (D.C. Bar No. PA0037)
Sven Collins*
Michi Tsuda*
Mimi Hu Brouillette*
* Motion for Pro Hac Vice Pending
SQUIRE PATTON BOGGS (US) LLP
1801 California St., Ste 4900
Denver, CO 80202
(303) 894-6173
E-mail: stephen.nash@squirepb.com

Counsel for Plaintiffs