**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BANNER HEART HOSPITAL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| SYLVIA M. BURWELL, Secretary, | ) | Case No. 1:14-cv-1195 (APM) |
| United States Department of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

REPLY CONCERNING RECORD FACTS AND BACKGROUND .....................................1

ARGUMENT ........................................................................................................3

I.   HHS Fails In Its Attempt To Rewrite *Bethesda* As Expressly Endorsing
     HHS's Renewed Self-Disallowance Policy When, In Fact, HHS's Policy Still
     Conflicts With The Statute, As Interpreted In *Bethesda*, Under *Chevron* Step
     One .........................................................................................................3

     A.  *Bethesda*, under *Chevron* step one, rejected HHS's current interpretation
         of "dissatisfaction" as requiring a hospital to present regulatory
         challenges to the Medicare contractor ....................................................3

     B.  HHS's *post hoc* attempt to repackage a jurisdictional requirement held
         futile under the statute as a cost reporting requirement also fails *Chevron*
         step one ...........................................................................................7

     C.  HHS's self-disallowance requirement also conflicts with the express
         statutory requirement that a hospital be dissatisfied with the final
         determination as to its "total program reimbursement" ...........................9

II.  HHS's Interpretation Is Also Not Reasonable Under *Chevron* Step Two ..................11

III. HHS's Renewed Self-Disallowance Policy Is Also Arbitrary and Capricious ...........13

     A.  The renewed self-disallowance policy lacks any sound policy justification .........13

     B.  HHS's refusal to acknowledge its flip flopping position on self-
         disallowance is further evidence of arbitrary and capricious agency
         action lacking a reasoned explanation ....................................................17

     C.  Restricting hospitals' statutory appeal rights where pertinent information
         was unavailable also renders the renewed self-disallowance policy
         arbitrary and capricious ......................................................................19

IV. HHS's Renewed Self-Disallowance Policy is Procedurally Invalid ...........................22

V.  HHS's Has Demonstrated No Reason For A Remand Where EJR Has
    Already Been Granted For Other Hospitals On the Same Regulatory
    Challenges .......................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alliance for Cannabis Therapeutics v. DEA,*
    15 F.3d 1131 (D.C. Cir. 1994) ....................................................................................24

*Animal Legal Def. Fund, Inc. v. Glickman,*
    204 F.3d 229 (D.C. Cir. 2000) ....................................................................................23

*Athens Cmty Hosp. v. Schweiker,*
    743 F.2d 1 (D.C. Cir. 1984) ........................................................................................21

*Banner Health v. Burwell,*
    55 F. Supp. 3d 1 (D.D.C. 2014) ..................................................................................20

*Battle Creek Health Sys. v. Leavitt,*
    No. 5:05-CV-53, 2006 U.S. Dist. LEXIS 78124 (W.D. Mich. Oct. 26, 2006) ......................10

*Bethesda Hosp. Ass'n v. Bowen,*
    485 U.S. 399 (1988) ........................................................................................... *passim*

*Del. Dept. of Natural Res. & Envtl. Control v. EPA,*
    785 F.3d 1 (D.C. Cir. 2015) ........................................................................................19

*Dist. Hosp. Partners, L.P. v. Burwell,*
    786 F.3d 46 (D.C. Cir. 2015) .............................................................................1, 20, 21

*Episcopal Hosp. v. Shalala,*
    994 F.2d 879 (D.C. Cir. 1993) ....................................................................................17

*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009) ....................................................................................................18

*First Am. Disc. Corp. v. CFTC,*
    222 F.3d 1008 (D.C. Cir. 2000) ..................................................................................24

*GCI Health Care Ctrs, Inc. v. Thompson*,
    209 F. Supp. 2d 63 (D.D.C. 2002) ..............................................................................23

*HCA Health Servs. v. Shalala,*
    27 F.3d 614 (D.C. Cir. 1994) ..................................................................................9, 10

*Heckler v. Ringer,*
    466 U.S. 602 (1984) ....................................................................................................17

*Le v. U.S. Dep't of State,*
 919 F. Supp. 27 (D.D.C. 1996) ..........................................................................12

*Little Co. of Mary Hosp. & Health Care Ctrs. v. Shalala,*
 24 F.3d 984 (7th Cir. 1994) .........................................................................5, 10

*Maine General Medical Center v. Shalala,*
 205 F.3d 493 (1st Cir. 2000) ..............................................................................10

*Mathews v. Eldridge,*
 424 U.S. 319 (1976)..............................................................................................6

*MCI Telecomms. Corp. v. FCC,*
 57 F.3d 1136 (D.C. Cir. 1995) ............................................................................24

*McLouth Steel Prods. Corp. v. Thomas,*
 838 F.2d 1317 (D.C. Cir. 1988) ..........................................................................24

*Nat'l Min. Ass'n v. Jackson,*
 856 F. Supp. 2d 150 (D.D.C. 2012) .....................................................................24

*PPG Indus., Inc. v. Costle,*
 659 F.2d 1239 (D.C. Cir. 1981) ..........................................................................22

*Sebelius v. Auburn Reg'l Med. Ctr.,*
 133 S. Ct. 817 (2013)............................................................................................21

*Select Specialty Hosp. – Bloomington, Inc. v. Burwell,*
 757 F.3d 308 (D.C. Cir. 2014) ..............................................................................8

*Sheppard v. Sullivan,*
 906 F.2d 756, 762 (D.C. Cir. 1990) .....................................................................25

*Sierra Club v. EPA,*
 322 F.3d 718 (D.C. Cir. 2003) ..............................................................................5

*Small Refiner Lead Phase-Down Task Force v. EPA,*
 705 F.2d 506 (D.C. Cir. 1983) ............................................................................24

*St. Luke's Hosp. v. HHS,*
 810 F.2d 325, 327 (1st Cir. 1987)...............................................................14, 15

*St. Michael's Med. Ctr. v. Sebelius,*
 648 F. Supp. 2d 18, 30 (D.D.C. 2009) .................................................................18

*Stormont-Vail Reg'l Med. Ctr. v. Bowen*,
    645 F.Supp. 1182 (D.D.C. 1986) ...........................................................................12

*Tex. Alliance for Home Care Servs. v. Sebelius*,
    811 F.Supp. 2d 76 (D.D.C. 2011) .........................................................................24

*UMDNJ-Univ. Hosp. v. Leavitt*,
    539 F. Supp. 2d 70, 76 (D.D.C. 2008) ..................................................................10

**Statutes**

42 U.S.C. § 552 ...............................................................................................22, 23, 24, 25

42 U.S.C. § 553 .....................................................................................................22, 24, 25

42 U.S.C. § 1395oo ...................................................................................................... *passim*

**Regulations**

42 C.F.R. § 405.1835 ......................................................................................................15, 24

42 C.F.R. § 405.1837 ...........................................................................................................10

42 C.F.R. § 405.1842 ...........................................................................................................16

Medicare Program; Provider Reimbursement Determinations and Appeals, 73
    Fed. Reg. 30,190 (May 23, 2008) ........................................................................17

Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute
    Care Hospitals and the Long-Term Care Hospital Prospective Payment
    System Changes and FY2011 Rates; Provider Agreements and Supplier
    Approvals; and Hospital Conditions of Participation for Rehabilitation and
    Respiratory Care Services; Medicaid Program: Accreditation for Providers of
    Inpatient Psychiatric Services, 75 Fed. Reg. 50,042 (Aug. 16, 2010) .....................14

Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute
    Care Hospitals and the Long-Term Care Hospital Prospective Payment
    System and Proposed Fiscal Year 2015 Rates; Quality Reporting
    Requirements for Specific Providers; Reasonable Compensation Equivalents
    for Physician Services in Excluded Teaching Hospitals; Provider
    Administrative Appeals and Judicial Review; Enforcement Provisions for
    Organ Transplant Centers; and Electronic Health Record (EHR) Incentive
    Program, 79 Fed. Reg. 27,978 (proposed May 15, 2014) ...................................7, 18

**Other Authorities**

Centers for Medicare and Medicaid Services, The Provider Reimbursement
    Manual-Part 2, Chapter 1, Cost Reporting – General, No. 15-2, § 115 (2008) ............... *passim*

Centers for Medicare and Medicaid Services, The Provider Reimbursement
    Manual-Part 2, Chapter 36, Hospital and Healthcare Complex, No. 15-2, §
    3630 (2008) ....................................................................................................................... 23

## INTRODUCTION

HHS's cross-motion and opposition to Plaintiffs' Motion for Summary Judgment, ECF

No. 29-1, ("Opposition" or "Opp'n") seeks to elevate *dicta* and dissents over binding Supreme

Court precedent.  HHS argues, in effect, that if its self-disallowance regulation had been in place

at the time of *Bethesda* it would have been affirmed.  That argument fails.  The underlying

rationale for HHS's pre-*Bethesda* self-disallowance policy and for its renewed self-disallowance

policy is the same – and the Supreme Court rejected that rationale under *Chevron* step one.

Moreover, as demonstrated in the Hospitals' Motion for Summary Judgment and as further

shown below, HHS's renewed self-disallowance policy is not a reasonable interpretation of the

statute, is arbitrary and capricious, and violates the APA's procedural requirements.

## REPLY CONCERNING RECORD FACTS AND BACKGROUND

HHS does not contest any of the record facts set forth by the Hospitals.  *See* Opp'n 9-11.

Accordingly, among other record facts, it is established that the following information was not

disclosed by HHS prior to the time that the Hospitals had to file their cost reports (in 2009):

- HHS's February 13, 2003 draft Interim Final Rule, along with its key findings and data,

supporting the Secretary's conclusion that, in order to comply with the outlier statute and public

interest, the outlier threshold immediately needed to be lowered at that time from $33,560 to

$20,760 (*see* Pls.' MSJ 16-18), a level which it did not again reach until FY 2009.[1]

- HHS had conducted no outlier reconciliation in FYs 2004-2010 and, by omitting that

material fact, failed to disclose (a) that it was not complying with its own regulations, (b) that

more than $650,000,000 of outlier payments still remained subject to reconciliation, and (c) that

---

[1] As shown *infra* at 20, HHS is incorrect that the draft Interim Final Rule has been rendered
irrelevant by *District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015).

1

HHS had given misleading rationalizations for not accounting for reconciliation when setting the outlier threshold in FY 2008.

HHS's Opposition contains several early statements that require correction.  First, HHS mistakenly accuses the Hospitals of failing to explain what "dissatisfied" and "required cost report" mean in § 1395oo.  Opp'n 3.  The Hospitals addressed "dissatisfied" in the context of regulatory challenges (*see* Pls.' MSJ 22-26); and, until its *post hoc* rationalization in its brief, HHS had not tried to justify its renewed self-disallowance policy as a reporting requirement. The Hospitals address HHS's contentions as to the "required cost report" below.

Further, HHS incorrectly states that "EJR <u>may</u> be available if the Board has jurisdiction but lacks authority to decide <u>some</u> 'questions of law or regulations. . .'"  Opp'n 9 (emph. added). However, § 1395oo(f) states "[p]roviders shall . . . have the right to obtain [EJR] . . . of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines . . . that it is without authority to decide the question . . . ."  42 U.S.C. § 1395oo(f).  Thus, the statute both (1) requires the Board to determine its jurisdiction and authority to review regulatory challenges and (2) guarantees that a hospital shall have a right to judicial review thereon when the conditions in § 1395oo(f) are met.

HHS also now claims, *post hoc*, that its 2008 renewed self-disallowance policy established "an exhaustion requirement."  Opp'n 7.  However, at the time of its rulemaking, HHS stated in the Federal Register, "we believe our proposal to be even less than an exhaustion requirement.  We believe it to be more akin to simply a presentment requirement."  AR 308-09.

Finally, HHS concedes that PRM § 115 only "generally instructs" providers on self-disallowance.  Opp'n 8.  The specific procedures are not found either in the regulation, the regulatory preamble, or PRM § 115.  *See* Pls.' Mot 43.

**ARGUMENT**

I.      **HHS Fails In Its Attempt To Rewrite *Bethesda* As Expressly Endorsing HHS's Renewed Self-Disallowance Policy When, In Fact, HHS's Policy Still Conflicts With The Statute, As Interpreted In *Bethesda*, Under *Chevron* Step One**

HHS does not seriously contest the fact that its renewed self-disallowance policy, as set forth in its 2008 regulation, is virtually the same one that HHS advanced in *Bethesda Hospital Association v. Bowen*, 485 U.S. 399 (1988).  At most, HHS raises a semantic quibble, describing its pre-*Bethesda* policy as precluding jurisdiction where a hospital <u>has</u> self-disallowed <u>by not claiming</u> costs to which it is not entitled under existing regulations, whereas now the policy precludes jurisdiction where the hospital <u>has not</u> self-disallowed <u>through claiming</u> costs to which it is not entitled under existing regulations.  *See* Opp'n 20.  HHS cannot mask the fact that its policy up until *Bethesda* was, just as now, to deny jurisdiction where a hospital has not followed procedures for presenting regulatory challenges, initially, to its Medicare contractor.  Just as it did in *Bethesda*, HHS now contends that the failure to note such challenges in the cost report means a provider cannot be "dissatisfied" under § 1395oo(a).  Thus, HHS's new self-disallowance policy is premised on the same interpretation of the statute the Supreme Court, in *Bethesda*, invalidated under *Chevron* step one.  That holding, which HHS's brief attempts to ignore, is fatal to HHS's renewed self-disallowance policy.

A.      ***Bethesda*, under *Chevron* step one, rejected HHS's current interpretation of "dissatisfaction" as requiring a hospital to present regulatory challenges to the Medicare contractor**

HHS improperly treats *Bethesda*'s holding – which interprets the plain language of the statute under *Chevron* step one – as if it were merely precatory.  Instead, HHS focuses on *Bethesda*'s *dicta*.  In *Bethesda*, however, HHS pressed the same arguments that it makes here and the Supreme Court rejected those arguments.

As the Hospitals have shown, HHS contended in *Bethesda* that "'a provider's right to a hearing before the Board extends only to claims presented to a fiscal intermediary because the provider cannot be 'dissatisfied' with the intermediary's decision to award the amounts requested in the provider's cost report.'"  Pls.' Mot. for Summ. J. & Req. for Oral Hr'g 22, ECF No. 23 (quoting *Bethesda*, 485 U.S. at 404) ("Pls.' MSJ").  HHS's Opposition does not address the Supreme Court's rejection of this argument under the "plain meaning of the statute" – *i.e.*, "[t]he strained interpretation offered by the Secretary is inconsistent with the express language of the statute." 485 U.S. at 404.  Moreover, HHS's Opposition ignores the Supreme Court's holdings that hospitals "could claim dissatisfaction, <u>within the meaning of the statute</u>, without incorporating their challenge in the cost reports filed with their fiscal intermediaries," and that, "under <u>this statutory scheme</u>, requiring submission of the regulatory challenge to the fiscal intermediary is quite unnecessary." *Id.* at 405, 407 (emphasis added).  As the Court explained, "under the statutory scheme, the fiscal intermediary is confined to the mere application of the Secretary's regulations, . . . [and] is without power to award reimbursement except as the regulations provide, and . . . any attempt to persuade the intermediary to do otherwise would be futile." *Id.* at 404. In other words, the Supreme Court has already decided that the statute does not permit HHS to impose a requirement that a hospital undertake the futile act of raising regulatory challenges with the Medicare contractor in order to show that the hospital is "dissatisfied" with the contractor's determination.

HHS's attempt to avoid this holding rests on a misreading of *Bethesda* and on circular logic.  HHS implausibly argues that the Supreme Court's *dicta* expressly greenlighted the imposition, by regulation, of the very same exhaustion requirement just held to be futile.  Opp'n

14.[2]  HHS argues that "there is nothing 'futile' in complying with such a regulation," as then the

Hospitals' "right to present their claim to the Board would have been preserved."  Opp'n 16; *see*

*also* Opp'n 20 ("it makes no sense to say it is 'futile' to comply with an existing regulation that

requires preservation of regulatory challenges in the cost report").  However, *Bethesda* held that

HHS's exhaustion requirement was futile because the Medicare contractor lacks any authority to

address regulatory challenges, not because the self-disallowance policy had yet to be formalized

in a regulation.  The undeniably futile aspect of HHS's self-disallowance policy, as relevant to

*Bethesda*'s holding, has not been cured by the agency's 2008 regulation – *i.e.*, presenting a

regulatory challenge to the Medicare contractor remains equally futile now as it was before

*Bethesda* because the contractor cannot act on the challenge.  And because the Medicare

contractor cannot make any determination based on a regulatory challenge, presenting such a

challenge to the contractor does nothing more to establish dissatisfaction than does presenting

the challenge to the Board in the first instance.[3]  Indeed, in *Bethesda*, HHS argued and lost the

point it presses here that a hospital can only be "dissatisfied" (later) if it first presents a

regulatory challenge to the contractor.  *Compare* Opp'n 14, *with* Brief for the Resp't at *18,

*Bethesda*, 485 U.S. 399 (1988) (No. 86-1764) ("If the intermediary awards the provider the

amount of reimbursement that the provider itself requested in its cost report, the provider cannot

---

[2] HHS unjustifiably relies on *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003), to suggest that *Bethesda*'s holding can be ignored in light of its *dicta*.  *Sierra Club* was "not at all certain" that the language in question was even *dicta* and not part of the holding, *id.*, and the reliance on *dicta* in *Sierra Club*, did not, as it would here, turn the Court's decision on its head.

[3] In this regard, a hospital presenting a regulatory challenge stands in contrast to one seeking additional reimbursement that it could have claimed, but did not claim, under existing regulations.  *See* Opp'n 14-15 (citing *Little Co. of Mary Hosp. & & Health Care Ctrs. v. Shalala*, 24 F.3d 984, 992 (7th Cir. 1994).  In such a case, the Medicare contractor is actually authorized to determine a hospital's claim for costs under existing regulations.

be dissatisfied with the intermediary's action; it can only be dissatisfied with its own reimbursement request.") (copy attached as Exhibit A).

Moreover, HHS's renewed self-disallowance policy does not even conform to *Bethesda*'s *dicta*, wherein the Court stated that a hospital might not be dissatisfied if it failed to comply with a "clearly prescribed <u>exhaustion</u> requirement."  485 U.S. at 404-05 (emphasis added).  HHS did not characterize its renewed self-disallowance policy as an "exhaustion requirement," but instead as "akin to simply a presentment requirement."  AR 308-09.[4]  And it is clear that hospitals satisfy the Medicare Act's presentment requirement for the adjudication of regulatory challenges by raising regulatory challenges in Board appeals.  *See Mathews v. Eldridge*, 424 U.S. 319, 328-29 (1976) (requiring that to satisfy the presentment requirement, a claim for benefits shall have been presented to the Secretary); *see also Bethesda*, 485 U.S. at 407 ("Under this statutory scheme, requiring submission of the regulatory challenge to the fiscal intermediary is quite unnecessary.").

Finally, HHS is incorrect that "the structure of the provision as a whole" supports its effort to re-impose its self-disallowance requirement.  *See* Opp'n 17-18.  As established below, the obligation to "file the required cost report" does not give HHS license to impose, for purposes of Board jurisdiction, a cost-reporting condition previously held to be futile, as an exhaustion requirement, under *Chevron* step one.  Moreover, as noted, the Supreme Court has already held that the statutory scheme makes clear that, with respect to regulatory challenges, "[t]he Board has a role in shaping the controversy that is subject to judicial review; the fiscal intermediary does not."  485 U.S. at 407.  The Supreme Court also held that "the language and

---

[4] More recently, HHS proposed to revise the appeals regulation to eliminate the self-disallowance requirement altogether as a necessary predicate to satisfy the dissatisfaction requirement.  *See* discussion *infra* at 7-8.

design of the statute as a whole" militates against reading the statute to require submitting

regulatory challenges to Medicare contractors.   *Id.* at 405-406.   Lastly, HHS's requirement that a

hospital express dissatisfaction with respect to regulatory challenges at the time of filing the cost

report conflicts with the statute's timeline to express dissatisfaction (*i.e.*, within 180 days <u>after</u>

receipt of the NPR).[5]   Thus, HHS's renewed self-disallowance requirement impermissibly

conflicts with the statutory scheme.

### B.   HHS's *post hoc* attempt to repackage a jurisdictional requirement held futile under the statute as a cost reporting requirement also fails *Chevron* step one

HHS's renewed self-disallowance policy (although now announced by regulation rather

than administrative adjudications and program instructions) is substantively the same as its pre-

*Bethesda* self-disallowance policy.[6]   Nonetheless, HHS now contends the renewed policy

identifies a necessary element of "the 'required' cost report under § 1395oo(a)."   *See* Opp'n 18,

28.   It is true that, in 2014, HHS proposed deleting its self-disallowance requirement as a

necessary jurisdictional requirement for Board appeals, and further proposed amending another

regulation governing cost reporting to make self-disallowance a necessary element for filing a

"complete" cost report.   *See* Pls.' MSJ 10-11; *see also* 79 Fed. Reg. 27,978, 28,208-16 (prop.

May 15, 2014) ("Upon further reflection . . . we believe that the [self-disallowance] requirement .

---

[5] Though HHS contends that this "argument makes no sense" (Opp'n 23 n.11), HHS effectively admits this point by characterizing the renewed self-disallowance requirement as necessary for a hospital to "preserve" its right, later before the Board, to express dissatisfaction.  *See* AR 307. Moreover, HHS is improperly conflating dissatisfaction as to costs allowed with dissatisfaction as to costs <u>not</u> allowed under existing regulations.  If allowable costs are omitted from the cost report, then the Medicare contractor cannot make a final determination regarding those costs. Conversely, the contractor has no power even to act on or to make final determinations concerning regulatory challenges, regardless of whether they are previewed in the cost report.

[6] HHS now asserts "the [*Bethesda*] providers . . . had complied with all existing rules and regulations in submitting their cost report . . ." (Opp'n 19), whereas in *Bethesda* HHS argued PRM § 115 "is essentially a codification of the [self-disallowance] rule applied by the Secretary and the Board in individual reimbursement decisions."  *See* Exhibit A (Resp't Br.) at * 58-61.

. . is more appropriately treated as a cost reporting requirement . . .").[7]  However, the

contemporaneous preamble accompanying the 2008 regulation described the renewed self-

disallowance policy as a Board jurisdiction requirement, not as a cost-reporting requirement.  *See*

AR 306-10 (discussing renewed self-disallowance policy under "Provider Hearing Rights").

Thus, HHS's attempt to justify the renewed self-disallowance policy as a reporting requirement

is merely a convenient litigating position (a position the agency proposed but effectively

abandoned in 2014) and should be rejected for that reason alone.  *See, e.g., Select Specialty*

*Hosp. – Bloomington, Inc. v. Burwell*, 757 F.3d 308, 314 n.3 (D.C. Cir. 2014) (rejecting the

government's *post hoc* rationalization).

Next, HHS contends that "the Board's jurisdiction is not mandatory" because the Board

has discretion under § 1395oo(d).  Opp'n 28-29.  This is a non-sequitur.  Section 1395(a) gives

the hospital a right to a Board hearing, and §1395(d) authorizes the Board to enlarge (not

constrict) the scope of the hearing to include issues not considered by the contractor.

Furthermore, HHS's attempt to read §1395(d) to allow HHS to impose a blanket prohibition of

all regulatory challenges that have not been presented in the cost report is inconsistent with the

plain meaning of the statute, which grants discretion to the Board and does not authorize HHS to

nullify that discretion with a blanket prohibition.  Opp'n 29.[8]  HHS's reading is also inconsistent

---

[7] It is equally true that HHS tabled these proposals in the midst of challenges to its new self-disallowance policy.  *See* Pls.' MSJ 10-11.

[8] HHS incorrectly asserts that the Hospitals did not challenge this alternative ground for HHS's renewed self-disallowance policy.  Opp'n 28-29.  In fact, the Hospitals expressly challenged both rationales asserted by HHS for the renewed self-disallowance policy as a "reasonable exercise" of "authority to issue regulations to administer the Medicare program" (*see* AR 309-320) – *i.e.*, the Hospitals demonstrated as baseless HHS's claims that such a cost-reporting requirement allows Medicare to "estimate better its potential liabilities" and to avoid disputes as to whether a self-disallowed cost is allowed or not.  *See* Pls.' MSJ 29, 31, 32.  Moreover, the Hospitals' arguments challenging HHS's renewed self-disallowance policy necessarily apply both to HHS's interpretation of the statutory dissatisfaction requirement and to HHS's attempt to skirt *Bethesda*

with its limited power to review the Board's EJR decisions.[9]  Further, HHS's argument

presupposes that, because the Board allegedly has discretion under §1395(d), it may exercise that

discretion for any reason, including one that the Supreme Court has rejected.  As *Bethesda* holds,

however, any attempt to exhaust regulatory challenges with a Medicare contractor would be

futile and is not required to establish a hospital's right to a Board hearing.[10]  In sum, it matters

not what HHS choses to call its renewed self-disallowance requirement, as the substance of the

rule violates the plain meaning of the statute under *Chevron* step one.

      **C.**     **HHS's self-disallowance requirement also conflicts with the express statutory requirement that a hospital be dissatisfied with the final determination as to its "total program reimbursement"**

        The Hospitals' Motion demonstrates that HHS's renewed self-disallowance requirement

invalidly requires a hospital's dissatisfaction as to "each specific item of reimbursement" rather

than, as the statute states, as to its "total program reimbursement."  Pls.' MSJ 26-27.  Relying on

*HCA Health Services v. Shalala*, 27 F.3d 614 (D.C. Cir. 1994) ("*HCA*"), HHS responds that

"total program reimbursement" does not modify the term "dissatisfied," but merely identifies the

NPR as the determination subject to Board review and to the dissatisfaction requirement, and

that dissatisfaction must lie as to each specific item challenged on appeal.  Opp'n 21-22.[11]  HHS

has misconstrued *HCA*, which actually supports the Hospitals' argument.

---

by claiming in its Opposition that the self-disallowance is actually a reporting requirement, which, again, is a position that HHS proposed but abandoned in its 2014 rulemaking.  Finally, for the avoidance of doubt, the Hospitals state affirmatively that they are challenging self-disallowance as a renewed reporting requirement or as an exercise of regulatory authority.

[9] The CMS Administrator may not review the Board's determination as to whether the Board has authority to decide a regulatory challenge.  42 U.S.C. § 1395oo(f).

[10] Further, as detailed *infra* at 12 and notes 15 & 16, HHS presented essentially the same rationale in *Bethesda* and that rationale was rejected by the Supreme Court.

[11] HHS is correct that the Hospitals' inadvertently misquoted the statute.  *See* Opp'n 21.  The quote, however, maintains fidelity to the substance of the statute and, in fact, tracks the Supreme

As explained in *UMDNJ-University Hosp. v. Leavitt*, the D.C. Circuit ruled in *HCA* that there is a fundamental, jurisdictional difference between a Board appeal predicated upon an original NPR and one predicated on a revised NPR. 539 F. Supp. 2d 70, 76 (D.D.C. 2008). As was the case in *HCA*, an appeal of a revised NPR is limited to the specific matters addressed by the Medicare contractor. However, unlike the hospitals in *HCA*, the Hospitals here appealed their original NPRs, which, as *HCA* discusses, are granted a much broader scope of review under § 1395oo. *HCA*, 27 F.3d at 617. The *HCA* court explains that once the Board obtains jurisdiction under § 1395oo(a), all matters in the original cost report – even ones not contested before the Medicare contractor – are "fair game for a challenge by virtue of § 1395oo(d)." *Id.*

HHS's reliance on *Little Co. of Mary Hosp. v. Shalala,* 165 F.3d 1162, 1165 (7th Cir. 1999), *Battle Creek Health Sys. v. Leavitt,* U.S. Dist. LEXIS 78124 (W.D. Mich. Oct. 26 2006), and the dissent in *Maine General* is also misplaced – those cases involved a provider's failure to claim, in its cost report, costs that were in fact allowable under existing regulations. None purports to address regulatory challenges.

Finally, the Hospitals' right to appeal does not "turn on the fortuity of whether [they] dispute[] some other aspect of the contractor's determination." Opp'n 22.[12] Rather, it rests on the fact that the Hospitals have presented their regulatory challenges to the Board, which is the first level within the agency at which (under the statutory scheme) those challenges are to be

---

Court's paraphrasing of same. *See Bethesda*, at 404 ("[U]nder subsection (a)(1)(A)(i), a provider's dissatisfaction with the amount of its total reimbursement is a condition to the Board's jurisdiction.").

[12] HHS incorrectly asserts the Hospitals have no other appeal issues with respect to their FY 2008 cost reports. As HHS knows, because the Hospitals are "under common ownership or control," they were required to appeal their outlier claims before the Board as a group pursuing a single issue; there can never be two or more issues in such group appeals. *See* 42 C.F.R. § 405.1837(a)(2) & (b). And, as HHS should also know, the Hospitals appealed other aspects of their reimbursement for FY 2008 in other mandatory group appeals and individual appeals.

presented and upon which action may be taken.[13]  Further, the Hospitals presented all claims

associated with treatments of extraordinarily costly patients to the agency, and the contractor

audited and made reimbursement determinations on these claims in the cost reports (albeit under

the existing regulations), a point ignored by the Opposition.  Pls.' MSJ 13-14.  Because the

statute expressly requires only dissatisfaction with the NPR determining the amount of total

program reimbursement, each of the Hospitals here has satisfied that condition.

　　　　In summary, HHS's renewed self-disallowance policy fails for the same reasons its prior

policy failed in *Bethesda* and, under *Chevron* step one, is entitled to no deference.

## II.　　HHS's Interpretation Is Also Not Reasonable Under *Chevron* Step Two

　　　　The Hospitals have also demonstrated that HHS's renewed self-disallowance policy fails

under *Chevron* step two.  *See* Pls.' MSJ 28-29.  Whereas Congress enacted § 1395oo to expand

administrative and court review under Medicare, HHS has construed the provision to constrict

review by seeking to require hospitals to take premature, futile actions so as to "preserve" their

future right to express dissatisfaction with their NPRs.  The arguments that HHS advances in an

attempt to justify its renewed self-disallowance policy as reasonable all fail.

　　　　First, HHS asserts that Congress intended that the Board perform an appellate "review"

function and not "serve as a tribunal of first impression," which intent allegedly justifies HHS's

requirement that providers self-disallow regulatory challenges (in the cost report) years before

they are submitted to the Board.  Opp'n 26.  However, HHS argued – and lost – this exact point

---

[13] The case law HHS cites involving providers that failed to claim all allowable costs (Opp'n 29) does not support HHS's contention that it could adopt for the Board a blanket prohibition overriding subsection (d).  Further, whatever reasons might support declining to reach issues that could have been determined by the contractor would not support declining to reach regulatory challenges.

in *Bethesda*.[14]  As the Supreme Court held in *Bethesda* "[u]nder this statutory scheme, requiring submission of the regulatory challenge to the fiscal intermediary is quite unnecessary."  485 U.S. at 407.  HHS may not re-litigate here an issue that it lost before the Supreme Court.  *See, e.g., Stormont-Vail Regional Med. Ctr. v. Bowen*, 645 F.Supp. 1182, 1191 (D.D.C. 1986) (holding HHS was barred from re-litigating issue decided by binding precedent); *Le v. U.S. Dep't of State*, 919 F. Supp. 27, 31 (D.D.C. 1996) (same).

Next, HHS argues that the EJR provision, which expressly channels regulatory challenges through the Board, actually indicates that Congress intended such challenges first be channeled through the Medicare contractor.  *See* Opp'n 26.  This is another argument that HHS made and lost in *Bethesda*.[15]  Unequivocally rejecting this argument, the Supreme Court held, "The Board has a role in shaping the controversy that is subject to judicial review; the fiscal intermediary does not."  485 U.S. at 407.

HHS also implausibly asserts that § 1395oo(d), which expressly authorizes the Board to address matters on the cost report not considered by the Medicare contractor, has no bearing on regulatory challenges "that the contractor was not even given the opportunity to consider."

---

[14] *See* Exhibit A (Resp't Br.) at * 27 (arguing "[t]he term 'review' in the Board's name indicates that the Board's function is to review the reimbursement determinations of fiscal intermediaries, not to make those determinations in the first instance."); *id.* *44-5 (arguing that the Board is "to serve as an appellate body to referee disputes between providers and their intermediaries."); *id.* at * 46 ("In sum, the legislative history strongly reinforces the conclusion that a provider is entitled to a Board hearing only with respect to reimbursement claims raised before the intermediary.").

[15] *See* Exhibit A (Resp't Br.) at ** 47-55 (arguing that construing § 1395oo to require channeling regulatory challenges to the Medicare contractor allegedly serves policies of finality and administrative efficiency, including allegedly permitting the contractor to comprehensively consider all reimbursement claims efficiently, avoiding alleged duplication of effort, and allegedly providing the Board the benefit of the contractor's expert assessment of the regulatory challenge); *id.* at ** 56-57 (arguing that "even where an administrative tribunal lacks authority to grant the relief sought by a party, the agency should nevertheless be allowed to determine whether the claim does in fact turn upon the challenge to the governing regulation or statute, as well as whether the claim is otherwise invalid or cognizable under a different statutory or regulatory provision.").

Opp'n 27.  Once again, the Supreme Court disagreed with HHS on this point in *Bethesda*. *Compare* 485 U.S. at 405-406 (holding that § 1395oo(d) "allows the Board, once it obtains jurisdiction pursuant to subsection (a), to review and revise a cost report with respect to matters not contested before the fiscal intermediary,") *with* Exhibit A (Resp't Br.) at ** 32-36 (arguing under its old self-disallowance policy that § 1395oo(d) does not authorize the Board to consider regulatory challenges that were not presented to contractors).

Finally, HHS contends that the reasonableness of its renewed self-disallowance policy is demonstrated because the policy was "explicitly invited" by *Bethesda*.  Opp'n 28.  This assertion ignores both the Court's reasoning and the Court's actual holding in *Bethesda*, neither of which invited HHS to impose a futile exhaustion requirement that is contrary to the statutory scheme, much less the very same self-disallowance requirement the Court was then holding violated the statute.  And it is plainly not reasonable for HHS to attempt to redeploy a requirement long-since rejected by the Supreme Court merely by recasting it as a reporting requirement rather than a jurisdictional requirement.

In summary, HHS's renewed self-disallowance policy unreasonably cuts against the express intent of Congress to expand appeal rights and to channel regulatory challenges through the Board (the initial administrative actor charged by Congress with any role in such challenges). In any form, HHS's renewed self-disallowance policy is a thinly disguised and improper effort to limit judicial review of regulatory challenges.

## III.    HHS's Renewed Self-Disallowance Policy Is Also Arbitrary and Capricious

### A.    The renewed self-disallowance policy lacks any sound policy justification

The Opposition spends many pages espousing the alleged virtues of HHS's renewed self-disallowance policy.  However, HHS ignores three fundamental facts that render the renewed policy futile: (1) Medicare contractors do not audit and review costs associated with regulatory

13

challenges; (2) "[n]either the [contractors] nor the Board has the authority to declare regulations invalid," *Bethesda*, 485 U.S. at 406; and (3) regardless of any action Medicare contractors might take, Congress directed the Board (not the contractor) to determine whether it has authority to decide "a question of law or regulations."  42 U.S.C. § 1395oo(f).

HHS argues that its renewed self-disallowance policy is beneficial to hospitals in requiring them to self-disallow items they think may not be permitted under current regulations. HHS posits a scenario where a hospital mistakenly believes that a cost is not allowable, and argues that requiring self-disallowance is thus helpful because the contractor could identify such an error.  Opp'n 31-32.  However, this rationalization relies on the false premise that contractors review protested items.  *See* Pls. MSJ 31.  HHS has offered no evidence that contractors actually undertake such review.  The only example, offered in footnote 12, undercuts HHS's argument because, in *St. Luke's Hospital v. HHS*, the hospital included an item in its cost report "list[ing] expenses for which reimbursement [was] 'self-disallowed.'"  810 F.2d 325, 327 (1st Cir. 1987). The contractor did <u>not</u> review the self-disallowed costs, and it was the Board, and later the court, that corrected the provider's mistaken belief.  *Id.*

Indeed, in the Federal Register HHS plainly states that contractors "are not required to review each protested cost or item to decide to remove or allow that cost or item."  AR 310. HHS now equivocates by suggesting that contractors might nonetheless volunteer their time to review self-disallowed items (Opp'n 34), but shows no incentive they might have to do so.[16]

---

[16] HHS also argues that the Secretary can order contractors to audit self-disallowance items "for her own purposes."  Opp'n 34 & n.14.  However, the only example given (Opp'n 34 n.14) did not show HHS, through contractors, relying on information from self-disallowance.  75 Fed. Reg. 50,042, 50,275-286 (Aug. 16, 2010) (containing no discussion of audits of self-disallowed items).  The Federal Register pages cited by HHS discuss HHS's new data matching process for the disproportionate share hospital adjustments.  To the extent HHS is relying on a discussion

Thus, the practical reality is that contractors might, at best, review protested items *ad hoc*, which is not a reasoned basis to impose on every cost report a self-disallowance requirement having the actual effect of cutting off statutory appeal rights.  *See Bethesda* at 408.

HHS also offers *post hoc* justification of other hypothetical ways contractors <u>could</u> add value to the appeals process "through consultation, discussion and education about the applicable Medicare policies."  Opp'n 32.  Again, without any requirement or incentive for contractors to offer such services, without any support from the AR in this case, and with *St. Luke's Hospital* proving just the opposite, this litigating position is not persuasive.

Further, HHS is incorrect that the renewed self-disallowance policy will eliminate disputes before the Board over whether an item of payment is allowed or not.[17]  If a hospital challenges a regulation where the cost is actually allowed, the net result is the same regardless of whether the challenge is omitted from the cost report or listed as a protested item.  The statute directs only the Board to determine whether it is without authority to review the regulatory challenge.  Also, the parties agree that a portion of § 405.1835, although not at issue in this case, provides that if allowable costs are omitted from the cost report, whether intentionally or mistakenly, the provider would not be entitled to recovery.  Opp'n 35.  However, HHS's assertion that hospitals "might attempt to circumvent the rule by" claiming that an omitted cost item was not allowable ignores this portion of § 405.1835 that requires hospitals to include all allowable costs.  Opp'n 35.  Moreover, the bright line HHS now imagines does not exist because § 1395oo(d), as interpreted by the Supreme Court, expressly allows the Board to consider such

---

pertaining to the reopening of cost reports and issuance of revised NPRs (*id.* at 50,284), reopening is neither related to nor dependent on self-disallowance.

[17] HHS made a very similar argument, in *Bethesda*, that contractors should "be allowed to determine whether the claim does in fact turn upon the challenge to the governing regulation or statute. . . ."  Exhibit A at * 56-57.  However, that argument failed to persuade in *Bethesda*.

omitted costs where jurisdiction lies. Thus, such allowable, but omitted costs could be at issue regardless. In the end, HHS's rationalization boils down to "administrative convenience" – *i.e.*, the bald notion that cutting off appeal rights will limit the number of appeals. That is not what Congress intended when it expanded appeal rights with § 1395oo. *See supra* at 11-13.

Indeed, a mistaken belief over whether a cost is allowed is not at issue here. The Hospitals are challenging the validity of various outlier regulations, a "question of law or regulations" over which the Board must determine it has no authority. 42 U.S.C. § 1395oo(f).[18] Thus, regardless of whether the challenge to a regulation is indicated on the protest line of the cost report, "[n]either the [contractors] nor the Board has the authority to declare regulations invalid." *Bethesda*, 485 U.S. at 406. Such a challenge may only be resolved by judicial review.

Further, HHS's argument that self-disallowance helps to develop a record early in the administrative process (Opp'n 32) is undercut by its assertion that "claims subject to the self-disallowance requirement will, by their nature, typically involve questions of policy, and thus should not require significant factual investigation . . . ." Opp'n 38. This argument also ignores the reality that the self-disallowance record serves no purpose in the regulatory scheme – whenever a "question of law or regulations" is involved, there is no factual record relevant to the appeal for the contractor to develop. Instead, to determine whether it has authority, the Board requires specific documentation from a hospital that is different from the information required by PRM § 115. *See* 42 C.F.R. § 405.1842 (EJR); Board Rules 42. At best, the self-disallowance requirements merely develop a placeholder record, one which is neither reviewed, audited, nor binding in any way. The only demonstrable use of such a placeholder record appears to be,

---

[18] As noted *supra* at n.9, HHS lacks power to review the Board's "authority" determination.

where it is absent, to cut off regulatory challenges that otherwise meet all statutory jurisdiction requirements.

HHS's final attempt to justify its renewed self-disallowance policy relies on the principle of exhaustion and a general appeal for deference.  Opp'n 33 & 36.  But HHS has previously repudiated its characterization of the renewed self-disallowance policy as an exhaustion requirement.  73 Fed. Reg. at 30,196-97 (AR 308-09) ("[W]e believe our proposal to be even less than an exhaustion requirement.  We believe it to be more akin to simply a presentment requirement."); *see also* 79 Fed. Reg at 28,212 (explaining that proposal to eliminate self-disallowance as a "jurisdictional requirement certainly does not conflict with the 'dissatisfied' provision in [the statute]").  *Heckler v. Ringer* also does not support HHS's argument that exhaustion is helpful at any cost.  466 U.S. 602 (1984).  The plaintiffs in *Heckler* completely skipped the administrative process and sued directly in court.  *Id.* at 609-12.  Here, the Hospitals presented their regulatory challenges at the first level within the agency, under the statutory scheme, where the challenges could be acted upon.  Finally, the Hospitals' arguments are meant to challenge HHS's explanations for its renewed self-disallowance policy and to show that HHS has invalidly imposed a futile requirement.  The courts would not "interfere with the policy decisions of an agency" if HHS "did . . . all that the APA required."  *Episcopal Hosp. v. Shalala*, 994 F.2d 879, 884 (D.C. Cir. 1993).

**B.    HHS's refusal to acknowledge its flip flopping position on self-disallowance is further evidence of arbitrary and capricious agency action lacking a reasoned explanation**

HHS's position that its renewed self-disallowance policy did not represent a change in "policy" is based on wordplay and is incorrect.  HHS has recently admitted (1) that, pre-*Bethesda*, HHS required providers to present regulatory challenges to contractors to demonstrate dissatisfaction, (2) that "the Supreme Court rejected our longstanding policy in *Bethesda*,"

17

following which HHS "no longer required providers to" present such regulatory challenges, but (3) that, in 2008, HHS once again imposed such a requirement.  *See* 79 Fed. Reg. at 28,208.[19] Thus, along with HHS's proposal in 2014 to, yet again, recast its self-disallowance policy as a cost-reporting requirement, HHS's multiple changed positions are admitted.

The question here is not whether a heightened standard of review applies to HHS's flip-flops.  Instead, as shown in Argument III.D of the Hospitals' Motion (which HHS has failed to address), HHS's failure to acknowledge its changed position in 2008 flunks the standards set by *FCC v. Fox Television Stations, Inc.*  556 U.S. 502, 515 (2009) ("the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.  An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").  Instead of acknowledging the policy change, *id.* at 517, HHS here continues to deny (and does not provide a reasoned explanation for) any change in position, which comprises irrational decision making.[20]

---

[19] Indeed, the 2008 change in policy played out in cost reports here at issue.  Due to corporate restructuring, two of the plaintiffs (Banner Boswell and Banner Del Webb) each filed two split-year cost reports for 2008 (the first for January 1, 2008- August 31, 2008, and the second for September 1, 2008-December 31, 2008).  Board AR 11.  Although, none of these cost reports protests the outlier issue, *id.*, the Board accepted jurisdiction and granted EJR for the set of NPRs covering the first half of the year, and denied jurisdiction over the second set of NPRs on the basis of the renewed self-disallowance policy (which applies to cost reports with fiscal years ending on or after December 31, 2008).  Board AR 11.

[20] Unlike the plaintiffs in *St. Michael's Medical Center v. Sebelius*, the Hospitals are not relying on HHS's subsequent change in position to argue that the prior 2008 renewed self-disallowance policy is unreasonable.  *Compare* 648 F. Supp. 2d 18, 30 (D.D.C. 2009), *with supra* Section Argument III.B (arguing that HHS's failure to admit and clearly explain its repeated change in interpretation renders the 2008 policy arbitrary and capricious).  Here, HHS's subsequent actions relating to the renewed self-disallowance policy (*i.e.*, (a) abandoning part of its regulation relating to appeals taken where an NPR is not timely issued and (b) proposing to completely rewrite the policy as a "reporting requirement" and then abandoning that proposal) further evidence HHS's unstable and still evolving attempts to justify this requirement.  These inconsistent rationalizations used to justify interpretation of the same statute should not command deference.

**C.    Restricting hospitals' statutory appeal rights where pertinent information was unavailable also renders the renewed self-disallowance policy arbitrary and capricious**

HHS has failed to respond to two concrete examples showing where insufficient information resulted in hospitals' inability to protest costs (to self-disallow) on their cost reports. Instead, HHS relegates any attempted rebuttal to a footnote.  This effort fails to confront, much less rebut, the Hospitals' argument that the renewed self-disallowance policy is arbitrary and capricious (as promulgated and as applied) because it punishes hospitals for not being able to guess what issues will later be revealed when information, solely available to HHS at time of the cost report filing, is later disclosed by HHS, its Office of Inspector General or some other source.

The Hospitals offered two concrete examples of this flawed application of the renewed self-disallowance policy.  The first is the rural floor budget neutrality issue, which reflected HHS's systemic, compounding reimbursement error that did not come to light until years after affected cost reports were due.  Pls.' MSJ 36-38.  HHS's Opposition fails even to acknowledge that the self-disallowance rule facially barred challenge to HHS's clear, compounding error for FYs ending on or after December 31, 2008.  That example alone sufficiently rebuts HHS's unsupported response to comments that "there should [not] be any significant difficulty" for providers to identify all challenges to reimbursement policies within 5 months after close of the fiscal year.  Opp'n 40.  And that example shows that the renewed self-disallowance policy is arbitrary and capricious due to HHS's failure to respond adequately to "relevant and significant comments."  *See Del. Dept. of Natural Res. & Envtl. Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (mandate stayed on unrelated grounds through May 1, 2016).

As to the second example – the Hospitals' specific proof of pertinent outlier information not available until years after their cost reports were due – HHS has relegated its response to a lengthy ten-point-font footnote.  *See* Opp'n 39 n.17.  This footnote presents flawed legal

19

standards and incorrect factual statements.  First, contrary to HHS's assertion, the Hospitals specified that the Interim Final Rule would have put them on notice that, in 2003, HHS considered but then hid the alternative of lowering the FLT to $20,760 (an alternative which HHS stated was compelled by the statute and in the public interest), but then failed to lower the FLT to that level until 2009.  Pls.' MSJ 17.  Had the Interim Final Rule's data and analysis been timely disclosed, this information would have influenced the Hospitals' analysis as to whether to challenge the 2003 revised payment regulation and the FLTs applied during their 2008 fiscal years.  *Id.*  *District Hospital Partners*, 786 F.3d 46 (D.C. Cir. 2015), does not nullify the relevance of the Interim Final Rule to this case – the D.C. Circuit's ruling as to HHS's outlier regulations for FYs 2004-2006 suggests a different question than the impact that knowledge of the data and analysis set forth in the Interim Final Rule, had they been timely disclosed, would have had on the content of the Hospitals' cost reports.[21]  Indeed, after *District Hospital Partners* was decided, another judge of this court held that the Interim Final Rule continues to have relevance – *i.e.*, that it "goes to the heart of establishing [HHS]'s promulgation of and continued application of invalid Fixed Loss Threshold Regulations as arbitrary and capricious, because it demonstrates that the agency knew that lowering the threshold would correct the problems engendered by its earlier regulations and believed it was obligated to do so immediately, but did not.'"  Mem. Op. at 9, Lee Mem'l Hosp. v. Burwell, No. 13-cv-00643 (RMC) (D.D.C. June 11, 2015), ECF No. 62.[22]  That case, as here, challenges HHS's 2008 and 2003 outlier regulations.

---

[21] HHS is wrong in stating that *District Hospital* was litigated by the undersigned.  The undersigned submitted an *amicus* brief in the D.C. Circuit appeal but did not litigate the case.

[22] While another judge of this Court has ruled to the contrary, *see Banner Health v. Burwell*, 55 F. Supp. 3d 1, 9-11 (D.D.C. 2014), that decision (which upon entry of a final judgment is subject to appeal) is premised on an improperly narrow view of what comprised the material on which HHS relied – *Banner Health* held that, since HHS's published rulemaking disregarded the adverse findings, data and conclusions of the 2003 draft Interim Final Rule, *ipso facto* HHS

Similarly, the OIG Report contained information, not disclosed until years after the Hospitals filed their FY 2008 cost reports, which was relevant to challenging HHS's FY 2008-2009 outlier regulations.  Pls.' MSJ 18-20.  That OIG Report reveals that HHS misrepresented the key reason it was not accounting for reconciliation of outlier payments in setting the thresholds, and shows that the stated reasons were arbitrary and capricious.

HHS argues that all deadlines have deadlines.  While this is of course true, it does nothing to explain why, without Congressional authorization, HHS should be permitted to shorten a statutory appeal period (by several years).  And HHS has not even attempted to explain why it should be permitted to do so when HHS itself is in sole possession of the information necessary to inform the appeal.  Indeed, "efforts by an agency to enforce tight filing deadlines in cases where there are credible allegations that filing delay was due to the agency's own misfeasance may not survive deferential review." *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 830 (2013) (Sotomayor, J., concurring).  HHS suggests that the filing of an amended cost report provides sufficient recourse.  Opp'n 39.  However, contractors' decisions not to reopen or to allow amendment are unreviewable, *Athens Cmty. Hosp. v. Schweiker*, 743 F.2d 1, 4 n.4 (D.C. Cir. 1984), and, as HHS knows, contractors regularly deny amendments offered to comply with the self-disallowance policy.  Thus, HHS's suggested remedy is illusory, leaving hospitals with no recourse.

---

could not have relied on them in the rulemaking.  In fact, however, HHS engaged in but one study of the underlying facts in support of its proposed rulemaking, and redacted only those facts that were diametrically opposed to the regulatory action it was proposing.  Furthermore, *District Hospital*'s holding that the draft Interim Final Rule was irrelevant as to the FY 2004 threshold regulation rulemaking, 786 F.3d at 58, does not carry over to this case where the Hospitals will challenge HHS's 2003 rulemaking to amend the agency's outlier payment regulations.  *See* Board AR 36-37.  HHS redacted portions of its studies on which it relied in promulgating those 2003 amendments, thereby frustrating any opportunity for public comment.

**IV.     HHS's Renewed Self-Disallowance Policy is Procedurally Invalid**

HHS does not deny that it is bound by the publication and notice requirements under sections 552 and 553 of the APA.[23]  The Hospitals have demonstrated that HHS violated both of these requirements, and HHS's Opposition fails to demonstrate any valid excuse for such violations.

First, HHS has not refuted that, under section 552, "[i]f a required definition or procedure is part of a rule, it must be published or incorporated by reference in the Federal Register." *PPG Indus., Inc. v. Costle*, 659 F.2d 1239, 1250 (D.C. Cir. 1981) (citing 5 U.S.C. § 552(a)(1)(D)). Merely mentioning PRM § 115 in the rulemaking preamble, without following the steps for incorporation by reference (*see* Pls' MSJ 41), violated this requirement.  HHS attempts to distinguish between "legal obligations" versus "applicable procedures," and argues that publishing a general instruction to self-disallow was sufficient, even though the rule attempted to incorporate unspecified "applicable procedures."  Opp'n 41-42.  However, the D.C. Circuit has rejected similar distinctions.  *See PPG Indus.*, 659 F.2d at 1249-50 (rejecting EPA's argument the public was aware of the general reporting requirement and "that the [referenced document] did not impose any additional requirements.").[24]  Because HHS intended the applicable procedures of PRM § 115 "to be made mandatory by means of the rule," but "neither published nor properly incorporated [by reference] in the Federal Register," "the [Hospitals] may not in any manner be required to resort to, or be adversely affected by such unpublished materials." *Id.*

---

[23] The question is not whether PRM § 115 is subject to notice and comment rulemaking or the publication requirement.  Thus, footnote 19 in HHS's Opposition can be disregarded.

[24] HHS's only rebuttal to *PPG* is that EPA's failure was more egregious than HHS's failure. Opp'n 41.  Yet the D.C. Circuit's observation that EPA's proposed rule did not indicate a change in legal obligation was related to the court's analysis of whether EPA met its requirements under section 553, not under section 552's publication requirements.  659 F.2d at 1249-50.  Here, the Hospitals cite to *PPG* for its standards for publication as required under section 552 of the APA, which applies regardless of whether HHS also violated the notice requirement under section 553.

(internal citations omitted).  Indeed, although HHS purports to make PRM § 115 a binding part of its regulation, the forward to the PRM explicitly states that it "does not have the effect of regulations."  PRM § PR1 Foreword.  *See also GCI Health Care Ctrs., Inc. v. Thompson*, 209 F. Supp. 2d 63, 69 (D.D.C. 2002) (finding that the PRM is "not binding").

HHS's appeal to deference for its chosen level of specificity in a rule is unsupported. The case cited by HHS did not address the publication requirement under section 552, and "the level of generality" in that case related to whether the statute required the agency to impose a general obligation or, instead, permitted it to enumerate exceptions to the standard.  *Animal Legal Def. Fund, Inc. v. Glickman*, 204 F.3d 229, 235 (D.C. Cir. 2000).

HHS is also incorrect that the Hospitals had "actual notice" of the "applicable procedures."  Opp'n 42-43.  PRM § 115 has not changed since 1980, and Worksheet E, Part A of the cost report, both before and after 2008, has contained the same line for "PROTESTED AMOUNTS."  *See* Exhibit B (Worksheet E, Part A from FY 2007).  Thus, without any explanation and with only passing references to PRM § 115 in the Federal Register, the Hospitals were not, and could not be, on notice as to how the same language in the PRM now imposed different legal obligations under the renewed self-disallowance policy.  Further, HHS misunderstands the importance of the fact that PRM § 115 is rooted in the previous system of reasonable cost reimbursement.  Thus, this manual provision remained unchanged despite significant changes in the reimbursement system generally and in HHS's self-disallowance requirement specifically.  Any "actual notice" of HHS's position *du jour* on self-disallowance could not flow from the unchanged PRM § 115 itself.  Finally, while the Board explicitly relied on PRM § 3630.1 to deny jurisdiction to the Hospitals, this same § 3630 was not mentioned in the Federal Register, the self-disallowance regulation, or PRM § 115.

As for its failure to provide notice under section 553, HHS claims that notice was supplied by comments relating to PRM § 115.  However, this statement appears in a footnote and without record citation to any such comments.  Opp'n 43 n.20.  "If [HHS] do[es] not take [its] argument seriously enough to do more than mention it in a passing footnote, the Court will not on its own accord attempt to discern whether such unnamed and unargued [comments] do, in fact, exist."  *Nat'l Min. Ass'n v. Jackson*, 856 F. Supp. 2d 150, 158 (D.D.C. 2012).  Further, an agency "must *itself* provide notice of a regulatory proposal.  Having failed to do so, it cannot bootstrap notice from a comment."  *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983); *see also MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1142 (D.C. Cir. 1995) (rejecting the defense that "notice [the agency] gave must have been adequate because at least a few parties to the rulemaking did in fact comment").[25]  Where notice was inadequate, HHS's "consideration of the comments received in response thereto . . . no matter how careful, cannot cure the defect."  *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988) (internal citations omitted).

Finally, HHS's "no harm no foul" argument is meritless.[26]  HHS's underlying assumption that the Hospitals had actual notice of the "applicable procedure" is invalid.  *See*

---

[25] The two cases cited by HHS do <u>not</u> hold that a comment alone can prove sufficient notice. *See Tex. Alliance for Home Care Servs. v. Sebelius*, 811 F.Supp. 2d 76, 100 (D.D.C. 2011) (finding that notice was satisfied through the Secretary's description of purpose and invitation for comments and suggestions concerning the standards); *First Am. Disc. Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (finding that comments may constitute evidence of notice, but not that comments themselves satisfied the notice requirement).

[26] *Alliance for Cannabis Therapeutics v. DEA* is distinguishable because the petitioners did not challenge the validity of the underlying regulation for failure to publish a relevant standard.  15 F.3d 1131, 1136 (D.C. Cir. 1994).  Here, the Hospitals are challenging § 405.1835 violating both sections 552 and 553 when the standard was adopted.  Thus, this case is akin to the case distinguished by *Alliance for Cannabis* where the plaintiffs' "complaint was that they had not had a chance to challenge the standard at the time it was adopted."  *Id.* (distinguishing *McLouth Steel*, 838 F.2d at 1322-23).

*supra* at 22-23.  Further, the Hospitals did "do <u>something</u>" (Opp'n 44) to effectuate a self-disallowance – they followed the path validated by the Supreme Court in *Bethesda* and excluded costs not permitted under existing reimbursement regulations.  HHS cannot escape the consequences of violating sections 552 and 553 (which impaired the public's notice of, and ability to comment on, the self-disallowance regulation) by relying on the fact that also it withheld pertinent information from the regulated community relating to outlier regulations (which separately hampered the Hospitals' ability to timely assess the validity of such outlier regulations).  The finding of no adverse impact in *Sheppard v. Sullivan* presented a very different situation where the statute and congressional intent mandated that the agency take certain actions such that, even if there had been proper publication and public participation, "the agency's approach [was] the only reasonable one."  906 F.2d 756, 762 (D.C. Cir. 1990).

**V.    HHS's Has Demonstrated No Reason For A Remand Where EJR Has Already Been Granted For Other Hospitals On the Same Regulatory Challenges**

The Hospitals have shown that a remand would be pro forma and only delay the inevitable grant of EJR for the Hospitals to pursue their appeals in court.  *See* Pls.' MSJ.  HHS's response ignores both that another judge of this court has effectuated the same relief in a parallel outlier case appeal, and that portions of the Hospitals' outlier appeals are already proceeding with their claims on the merits in another case pending before another judge in this court.  While remand is the ordinary remedy, HHS has shown no reason why putting the Hospitals through such a yo-yo-like process makes any sense in this particular case.  Retaining jurisdiction is the most sensible path forward.

Date: October 29, 2015                     Respectfully submitted,

                                           *s/ Stephen Nash*
                                           Stephen Nash (D.C. Bar No. PA0037)
                                           Sven Collins*
                                           Michi Tsuda*
                                           Mimi Hu Brouillette*
                                           * Admitted Pro Hac Vice
                                           SQUIRE PATTON BOGGS (US) LLP
                                           1801 California St., Ste 4900
                                           Denver, CO 80202
                                           (303) 894-6173
                                           E-mail: stephen.nash@squirepb.com

                                           Counsel for Plaintiffs